CALIFORNIA MEDICAL ASSOCIATION ET AL. *v.*
FEDERAL ELECTION COMMISSION ET AL.

No. 79–1952.   Argued January 19, 1981—Decided June 26, 1981

MARSHALL, J., announced the Court's judgment and delivered the opinion of the Court with respect to Parts I, II, and IV, in which BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined, and an opinion with respect to Part III, in which BRENNAN, WHITE, and STEVENS, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 201. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 204.

*Rick C. Zimmerman* argued the cause for appellants. With him on the briefs was *David E. Willett.*

*Charles N. Steele* argued the cause for appellees. With him on the brief was *Kathleen Imig Perkins.*[*]

JUSTICE MARSHALL delivered the opinion of the Court with respect to Parts I, II, and IV, and delivered an opinion with respect to Part III, in which JUSTICE BRENNAN, JUSTICE WHITE, and JUSTICE STEVENS joined.

In this case we consider whether provisions of the Federal Election Campaign Act of 1971, 86 Stat. 11, as amended, 2 U. S. C. § 431 *et seq.* (1976 ed. and Supp. III), limiting the amount an unincorporated association may contribute to a multicandidate political committee violate the First Amendment or the equal protection component of the Fifth Amendment. Concluding that these contribution limits are consti-

---

[*]*Bruce J. Ennis, Jr.*, filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

*Louis R. Cohen, A. Stephen Hut, Jr., Roger M. Witten, Kenneth J. Guido, Jr.*, and *Ellen G. Block* filed a brief for Common Cause as *amicus curiae* urging affirmance.

tutional, we affirm the judgment of the Court of Appeals for the Ninth Circuit.

I

The California Medical Association (CMA) is a not-for-profit unincorporated association of approximately 25,000 doctors residing in California. In 1976, CMA formed the California Medical Political Action Committee (CALPAC). CALPAC is registered as a political committee with the Federal Election Commission, and is subject to the provisions of the Federal Election Campaign Act relating to multicandidate political committees.[1] One such provision, 2 U. S. C. § 441a (a)(1)(C), prohibits individuals and unincorporated associations such as CMA from contributing more than $5,000 per calendar year to any multicandidate political committee such as CALPAC.[2] A related provision of the Act, 2 U. S. C. § 441a (f), makes it unlawful for political committees such as CALPAC knowingly to accept contributions exceeding this limit.[3]

---

[1] Under the Act, a political committee is defined to include "any committee . . . which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U. S. C. § 431 (4) (1976 ed., Supp. III). A "multicandidate political committee" is defined as a "political committee which has been registered under section 433 of this title for a period of not less than 6 months, which has received contributions from more than 50 persons, and . . . has made contributions to 5 or more candidates for Federal Office." 2 U. S. C. § 441a (a)(4).

[2] Section 441a (a)(1)(C) provides in pertinent part that "[n]o person shall make contributions . . . to any other political committee in any calendar year which, in the aggregate, exceed $5,000." The Act defines the term "person" to include "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons." 2 U. S. C. § 431 (11) (1976 ed., Supp. III). Corporations and labor organizations, however, are prohibited by 2 U. S. C. § 441b (a) from making any contributions to political committees other than the special segregated funds authorized by § 441b (b)(2)(C), and hence these entities are not governed by § 441a (a)(1)(C).

[3] This section provides that "[n]o . . . political committee shall know-

In October 1978, the Federal Election Commission found "reason to believe" that CMA had violated the Act by making annual contributions to CALPAC in excess of $5,000, and that CALPAC had unlawfully accepted such contributions. When informal conciliation efforts failed, the Commission in April 1979 authorized its staff to institute a civil enforcement action against CMA and CALPAC to secure compliance with the contribution limitations of the Act. In early May 1979, after receiving formal notification of the Commission's impending enforcement action, CMA and CALPAC, together with two individual members of these organizations, filed this declaratory judgment action in the United States District Court for the Northern District of California challenging the constitutionality of the statutory contribution limitations upon which the Commission's enforcement action was to be based. Several weeks later, the Commission filed its enforcement action in the same District Court. In this second suit, CMA and CALPAC pleaded as affirmative defenses the same constitutional claims raised in their declaratory judgment action.

On May 17, 1979, pursuant to the special expedited review provisions of the Act set forth in 2 U. S. C. § 437h (1976 ed. and Supp. III),[4] the District Court certified the constitutional questions raised in appellants' declaratory judgment action to the Court of Appeals for the Ninth Circuit. In the meantime, pretrial discovery and preparation in the Commission's enforcement action continued in the District Court. In May 1980, a divided Court of Appeals, sitting en banc, rejected appellants' constitutional claims and upheld the $5,000 limit on annual contributions by unincorporated associations to multicandidate political committees. 641 F. 2d 619. Appellants sought review of that determination in this Court, again pursuant to the special jurisdictional provisions of 2 U. S. C.

---

ingly accept any contribution or make any expenditure in violation of the provisions of this section."

[4] See *infra*, at 188–189.

§ 437h (1976 ed. and Supp. III). The Commission subsequently moved to dismiss the appeal, and we postponed a ruling on our jurisdiction over this case pending a hearing on the merits. 449 U. S. 817 (1980).[5]

## II

Because the Commission vigorously contends that this Court does not have jurisdiction over this appeal, we first consider the complex judicial review provisions of the Federal Election Campaign Act.[6] The Act provides two routes by which questions involving its constitutionality may reach this Court. First, such questions may arise in the course of an enforcement proceeding brought by the Commission under 2 U. S. C. § 437g (1976 ed. and Supp. III). Such actions are filed by the Commission in the federal district courts, where they are to be accorded expedited treatment. §§ 437g (a)

---

[5] In the meantime, the District Court has entered judgment in favor of the Commission in its enforcement action against CMA and CALPAC. *Federal Election Comm'n* v. *California Medical Assn.*, 502 F. Supp. 196 (1980).

[6] Initially, we reject the Commission's suggestion that appellants may lack standing to raise the claims involved here. The grant of standing under § 437h, which this Court has held to be limited only by the constraints of Art. III of the Constitution, *Buckley* v. *Valeo*, 424 U. S. 1, 11 (1976) (*per curiam*), authorizes actions to be brought by the Commission, the national committee of a political party, and individuals eligible to vote in federal elections. The individual appellants in this case fall within this last category, and, as members and officers of CMA and CALPAC, have a sufficiently concrete stake in this controversy to establish standing to raise the constitutional claims at issue here. Accordingly, we do not address the question whether parties not enumerated in § 437h's grant of standing, such as CMA and CALPAC, may nonetheless raise constitutional claims pursuant to that section. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 264, n. 9 (1977). Compare *Martin Tractor Co.* v. *Federal Election Comm'n*, 460 F. Supp. 1017 (DC 1978), aff'd, 200 U. S. App. D. C. 322, 627 F. 2d 375, cert. denied *sub nom. National Chamber Alliance for Politics* v. *Federal Election Comm'n*, 449 U. S. 954 (1980), with *Bread Political Action Committee* v. *Federal Election Comm'n*, 591 F. 2d 29 (CA7 1979), appeal pending, No. 80–1481.

(6)(A) and (10) (1976 ed., Supp. III). The judgments of the district courts in such cases are appealable to the courts of appeals, with final review in this Court available upon certiorari or certification. § 437g (a)(9).

However, because Congress was concerned that its extensive amendments to the Act in 1974 might raise important constitutional questions requiring quick resolution,[7] it provided an alternative method for obtaining expedited review of constitutional challenges to the Act. This procedure, outlined in 2 U. S. C. § 437h (1976 ed. and Supp. III), provides in part:

> "The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." § 437h (a).

---

[7] Senator Buckley introduced the amendment incorporating § 437h into the Act, and noted:

"It merely provides for expeditious review of the constitutional questions I have raised. I am sure we will all agree that if, in fact, there is a serious question as to the constitutionality of this legislation, it is in the interest of everyone to have the question determined by the Supreme Court at the earliest possible time." 120 Cong. Rec. 10562 (1974).

The sole explanation of this provision in the House was by Representative Frenzel, who stated:

"I believe within this conference report there are at least 100 items questionable from a constitutional standpoint. . . .

"I do call . . . attention . . . to the fact that any individual under this bill has a direct method to raise these questions and to have those considered as quickly as possible by the Supreme Court." *Id.*, at 35140.

The statute further provides that decisions of the courts of appeals on such certified questions may be reviewed in this Court on direct appeal, § 437h (b), and it directs both the courts of appeals and this Court to expedite the disposition of such cases, § 437h (c).

Although Congress thus established two avenues for judicial review of constitutional questions arising under the Act, it failed to provide any mechanism for coordinating cases in which the same constitutional issues are raised by the same parties in both a § 437h declaratory judgment action and a § 437g enforcement proceeding. The Commission contends that this legislative oversight has allowed litigants, like appellants here, to disrupt and delay enforcement proceedings brought by the Commission under § 437g by instituting separate § 437h declaratory judgment actions in which the constitutional defenses to enforcement are asserted as affirmative claims. The Commission further argues that § 437h declaratory judgment actions may seriously undermine the functioning of the federal courts because of the special treatment that these courts are required to accord such cases. To alleviate these potential problems, the Commission urges this Court to construe the overlapping judicial review provisions of the Act narrowly so as to preclude the use of § 437h actions to litigate constitutional challenges to the Act that have been or might be raised as defenses to ongoing or contemplated Commission enforcement proceedings.[8] Under this proposed reading of § 437g and § 437h, the District Court in

---

[8] Although the Commission now contends that § 437h actions may not be maintained simultaneously with § 437g proceedings raising the same constitutional claims, it has in the past argued that the two review provisions are independent of each other and that § 437h actions could be brought by defendants in a § 437g proceeding to adjudicate any constitutional claims arising during the course of such proceedings. *Federal Election Comm'n* v. *Lance*, 635 F. 2d 1132, 1137, n. 3 (CA5 1981); *Federal Election Comm'n* v. *Central Long Island Tax Reform Immediately Committee*, 616 F. 2d 45, 48–49 (CA2 1980).

this case should have declined to certify appellants' constitutional claims to the Court of Appeals in light of the Commission's pending enforcement action against CMA and CALPAC. On this basis, we are urged by the Commission to dismiss the appeal in this case for want of jurisdiction.

Although we agree with the Commission that the judicial review provisions of the Act are scarcely a blueprint for efficient litigation, we decline to construe § 437h in the manner suggested by the Commission.[9] There is no suggestion in the language or legislative history of § 437h indicating that Congress intended to limit the use of this provision to situations in which no § 437g enforcement proceedings are contemplated or underway.[10] Section 437h expressly requires a district court to "immediately . . . certify *all* questions of the constitutionality of this Act" to the court of appeals. (Emphasis supplied.) We do not believe that Congress would have used such all-encompassing language had it intended to restrict § 437h in the manner proposed by the Commission.[11] Indeed, the cramped construction of the

---

[9] Even if the Commission's proposed construction of the statute were accepted, it remains unclear whether we would be required to dismiss this appeal. The only defendants in the Commission's § 437g enforcement proceeding are CMA and CALPAC. However, the plaintiffs in the § 437h action include, along with CALPAC and CMA, two individual doctors. These individuals have standing to bring this action, see n. 6, *supra,* and the Commission apparently does not contend that such parties, who are not involved in a pending or ongoing enforcement proceeding, are barred from invoking the § 437h procedure.

[10] The legislative history of the 1974 Amendments is silent on the interaction of the two provisions. However, the brief discussion in Congress of § 437h indicates that it was intended to cover all serious constitutional challenges to the Act. See n. 7, *supra.*

[11] The Commission suggests that the language of § 437h, authorizing eligible plaintiffs to "institute such actions . . . , including actions for declaratory judgments, as may be appropriate to construe the constitutionality of *any* provision of the Act," confers on the district court discretion to dismiss as "inappropriate" § 437h suits raising constitutional

statute proposed by the Commission would directly under-
mine the very purpose of Congress in enacting § 437h. It is
undisputed that this provision was included in the 1974
Amendments to the Act to provide a mechanism for the rapid
resolution of constitutional challenges to the Act. These
questions may arise regardless of whether a Commission en-
forcement proceeding is contemplated. Yet under the Com-
mission's approach, even the most fundamental and meritori-
ous constitutional challenge to the Act could not be reviewed
pursuant to § 437h, but instead could be considered only pur-
suant to the more limited procedure set forth in § 437g,[12] if
this question also happened to be raised in a Commission
enforcement action. If Congress had intended to remove
a whole category of constitutional challenges from the pur-
view of § 437h, thereby significantly limiting the usefulness
of that provision, it surely would have made such a limita-
tion explicit.

In addition, the language of § 437g itself undercuts the
Commission's contention that § 437h actions must be held
in abeyance if the same parties are or may be involved in
§ 437g enforcement actions brought by the Commission. The
statute expressly provides that § 437g enforcement actions

---

claims that are also presented in § 437g proceedings. We do not agree
that the word "appropriate" embodies the broad substantive limitation
proposed by the Commission. As the reference to declaratory judgment
actions in the preceding clause makes clear, the concept of an "appro-
priate" action refers only to the form in which the litigation is cast. Thus,
for example, a suit for damages would not be an "appropriate" action
for testing the facial validity of the Act. In any event, whatever ambi-
guity surrounds the meaning of the word "appropriate" in § 437h is dis-
pelled by the section's command that the district court "immedi-
ately . . . certify *all* questions of constitutionality" to the court of
appeals. (Emphasis added.)

[12] The judgments of the courts of appeals in § 437g cases are review-
able in this Court only upon certification or writ of certiorari. § 437g
(a)(9). In contrast, the judgments of the courts of appeals in § 437h
proceedings may be directly appealed to this Court. § 437h(b).

192

filed by the Commission in the district court are to be "put ahead of all other actions (other than other actions brought under this subsection *or under section 437h of this title)."* § 437g (a)(10) (emphasis added). If Congress had intended to coordinate § 437g and § 437h in the manner now proposed by the Commission, it is inconceivable that it would have chosen the above language. Instead, the wording of the statute plainly implies that actions brought under both sections may proceed in the district court at the same time. See *Bread Political Action Committee* v. *Federal Election Comm'n,* 591 F. 2d 29, 33 (CA7 1979), appeal pending, No. 80–1481. In sum, although Congress might have been wiser to orchestrate § 437g and § 437h in the manner proposed by the Commission, the statutory language and history belie any such intention.[13] We therefore conclude that we have jurisdiction over this appeal.[14]

---

[13] In reaching a contrary conclusion, the dissent today engages in a most unusual method of statutory interpretation. Although § 437h expressly requires a district court to "immediately . . . certify *all* questions of the constitutionality" of the Act to the court of appeals and although the legislative history of that provision clearly indicates Congress' intent to have constitutional challenges to the Act resolved through the § 437h procedure, the dissent blithely concludes that "neither the language of the Act nor its legislative history directly addresses the issue" before the Court today. *Post,* at 205. Having so neatly swept aside the relevant statutory language and history, the dissent proceeds to rewrite the statute in a manner it perceives as necessary to insure the "proper enforcement of the Act and . . . the sound functioning of the federal courts . . . ." *Ibid.* Under this reconstruction, § 437h may not be invoked by a party who has been "formally notified of a § 437g proceeding"; indeed, that provision may not even be used by those with an "identity of . . . interests" with a party who has been so notified. *Post,* at 208. While the concepts of "formal notification" and "identity of interests" which the dissent seeks to engraft on § 437h might well benefit the Commission in its effort to enforce the Act and might relieve the courts of appeals of the burden of some § 437h actions, the task before us is not to improve the statute but to construe it. We have already acknowledged that the

# III

Appellants' First Amendment claim is based largely on this Court's decision in *Buckley* v. *Valeo,* 424 U. S. 1 (1976) (*per*

---

statute, as we interpret it today, is subject to the criticisms raised by the dissent. *Supra,* at 190. The remedy, however, lies with Congress.

Moreover, in its effort to justify rewriting § 437h, the dissent exaggerates the burden § 437h actions have placed on the federal courts. To date, there have been only a handful of cases certified to the Courts of Appeals under this procedure. *Anderson* v. *Federal Election Comm'n,* 634 F. 2d 3 (CA1 1980); *Federal Election Comm'n* v. *Central Long Island Tax Reform Immediately Committee,* 616 F. 2d 45 (CA2 1980); *Republican National Committee* v. *Federal Election Comm'n,* 616 F. 2d 1 (CA2 1979), summarily aff'd, 445 U. S. 955 (1980); *Federal Election Comm'n* v. *Lance,* 635 F. 2d 1132 (CA5 1981); *Bread Political Action Committee* v. *Federal Election Comm'n,* 591 F. 2d 29 (CA7 1979), appeal pending, No. 80–1481; *Buckley* v. *Valeo,* 171 U. S. App. D. C. 172, 519 F. 2d 821 (1975), aff'd in part and rev'd in part, 424 U. S. 1 (1976); *Clark* v. *Valeo,* 182 U. S. App. D. C. 21, 559 F. 2d 642 (1972), summarily aff'd *sub nom. Clark* v. *Kimmitt,* 431 U. S. 950 (1977); *Martin Tractor Co.* v. *Federal Election Comm'n,* 200 U. S. App. D. C. 322, 627 F. 2d 375, cert. denied *sub nom. National Chamber Alliance for Politics* v. *Federal Election Comm'n,* 449 U. S. 954 (1980). Moreover, the Federal Election Campaign Act is not an unlimited fountain of constitutional questions, and it is thus reasonable to assume that resort to § 437h will decrease in the future. Under these circumstances, we do not believe that § 437h poses any significant threat to the effective functioning of the federal courts.

[14] While we thus decline to adopt the Commission's view, we believe that its concerns about the potential abuse of § 437h are in large part answered by the other restrictions on the use of that section. The unusual procedures embodied in this section are, at the very least, circumscribed by the constitutional limitations on the jurisdiction of the federal courts. *Buckley* v. *Valeo,* 424 U. S., at 11. A party seeking to invoke § 437h must have standing to raise the constitutional claim. *Ibid.* Furthermore, § 437h cannot properly be used to compel federal courts to decide constitutional challenges in cases where the resolution of unsettled questions of statutory interpretation may remove the need for constitutional adjudication. *Federal Election Comm'n* v. *Central Long Island Tax Reform Immediately Committee, supra,* at 51–53. See *Nixon* v. *Administrator of General Services,* 433 U. S. 425, 438 (1977); *Thorpe* v. *Housing Authority,* 393 U. S. 268, 283–284 (1969); *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932). Moreover, we do not construe § 437h to require

*curiam*). That case involved a broad challenge to the constitutionality of the 1974 Amendments to the Federal Election Campaign Act. We held, *inter alia,* that the limitations placed by the Act on campaign expenditures violated the First Amendment in that they directly restrained the rights of citizens, candidates, and associations to engage in protected political speech. *Id.,* at 39–59. Nonetheless, we upheld the various ceilings the Act placed on the contributions individuals and multicandidate political committees could make to candidates and their political committees, and the maximum aggregate amount any individual could contribute in any calendar year.[15] We reasoned that such contribution

---

certification of constitutional claims that are frivolous, see, *e. g., Gifford* v. *Congress,* 452 F. Supp. 802 (ED Cal. 1978); cf. *California Water Service Co.* v. *City of Redding,* 304 U. S. 252, 254–255 (1938) (*per curiam*), or that involve purely hypothetical applications of the statute. See, *e. g., Clark* v. *Valeo, supra; Martin Tractor Co.* v. *Federal Election Comm'n, supra;* 627 F. 2d, at 384–386, 388–390. Finally, as a practical matter, immediate adjudication of constitutional claims through a § 437h proceeding would be improper in cases where the resolution of such questions required a fully developed factual record. See, *e. g., Anderson* v. *Federal Election Comm'n, supra; Martin Tractor Co.* v. *Federal Election Comm'n, supra,* at 325, 627 F. 2d, at 378; *Mott* v. *Federal Election Comm'n,* 494 F. Supp. 131, 135 (DC 1980). These restrictions, in our view, enable a district court to prevent the abuses of § 437h envisioned by the Commission.

None of these considerations, however, pertain to this case. At least the individual appellants have standing to bring this challenge. See n. 6, *supra.* Additionally, appellants here expressly challenge the statute on its face, and there is no suggestion that the statute is susceptible to an interpretation that would remove the need for resolving the constitutional questions raised by appellants. Finally, as evidenced by the divided en banc court below, the issues here are neither insubstantial nor settled. We therefore conclude that this case is properly before us pursuant to § 437h.

[15] Specifically, this Court upheld the $1,000 limit on the amount a person could contribute to a candidate or his authorized political committees, 2 U. S. C. § 441a (a) (1) (A), the $5,000 limit on the contributions by a multicandidate political committee to a candidate or his authorized political committee, 2 U. S. C. § 441a (a) (2) (A), and the overall $25,000 annual ceiling on individual contributions, 2 U. S. C. § 441a (a) (3).

restrictions did not directly infringe on the ability of contributors to express their own political views, and that such limitations served the important governmental interests in preventing the corruption or appearance of corruption of the political process that might result if such contributions were not restrained. *Id.*, at 23–38.

Although the $5,000 annual limit imposed by § 441a (a) (1)(C) on the amount that individuals and unincorporated associations may contribute to political committees is, strictly speaking, a contribution limitation, appellants seek to bring their challenge to this provision within the reasoning of *Buckley.* First, they contend that § 441a (a)(1)(C) is akin to an unconstitutional expenditure limitation because it restricts the ability of CMA to engage in political speech through a political committee, CALPAC. Appellants further contend that even if the challenged provision is viewed as a contribution limitation, it is qualitatively different from the contribution restrictions we upheld in *Buckley.* Specifically, appellants assert that because the contributions here flow to a political committee, rather than to a candidate, the danger of actual or apparent corruption of the political process recognized by this Court in *Buckley* as a sufficient justification for contribution restrictions is not present in this case.

While these contentions have some surface appeal, they are in the end unpersuasive. The type of expenditures that this Court in *Buckley* considered constitutionally protected were those made *independently* by a candidate, individual, or group in order to engage directly in political speech. *Id.*, at 44–48. Nothing in § 441a (a)(1)(C) limits the amount CMA or any of its members may independently expend in order to advocate political views; rather, the statute restrains only the amount that CMA may contribute to CALPAC. Appellants nonetheless insist that CMA's contributions to CALPAC should receive the same constitutional protection as independent expenditures because, according to appellants,

this is the manner in which CMA has chosen to engage in political speech.

We would naturally be hesitant to conclude that CMA's determination to fund CALPAC rather than to engage directly in political advocacy is entirely unprotected by the First Amendment.[16] Nonetheless, the "speech by proxy" that CMA seeks to achieve through its contributions to CALPAC is not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection. CALPAC, as a multicandidate political committee, receives contributions from more than 50 persons during a calendar year. 2 U. S. C. § 441a (a)(4). Thus, appellants' claim that CALPAC is merely the mouthpiece of CMA is untenable. CALPAC instead is a separate legal entity that receives funds from multiple sources and that engages in independent political advocacy. Of course, CMA would probably not contribute to CALPAC unless it agreed with the views espoused by CALPAC, but this sympathy of interests alone does not convert CALPAC's speech into that of CMA.

---

[16] In *Buckley*, this Court concluded that the act of contribution involved some limited element of protected speech.

"A contribution serves as a general expression of support for a candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." 424 U. S., at 21 (footnote omitted).

Under this analysis, CMA's contributions to CALPAC symbolize CMA's general approval of CALPAC's role in the political process. However, this attenuated form of speech does not resemble the direct political advocacy to which this Court in *Buckley* accorded substantial constitutional protection.

Our decision in *Buckley* precludes any argument to the contrary. In that case, the limitations on the amount individuals could contribute to candidates and campaign organizations were challenged on the ground that they limited the ability of the contributor to express his political views, albeit through the speech of another. The Court, in dismissing the claim, noted:

"While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate *involves speech by someone other than the contributor.*" 424 U. S., at 21 (emphasis added).

This analysis controls the instant case. If the First Amendment rights of a contributor are not infringed by limitations on the amount he may contribute to a campaign organization which advocates the views and candidacy of a particular candidate, the rights of a contributor are similarly not impaired by limits on the amount he may give to a multicandidate political committee, such as CALPAC, which advocates the views and candidacies of a number of candidates.[17]

We also disagree with appellants' claim that the contribution restriction challenged here does not further the governmental interest in preventing the actual or apparent corruption of the political process. Congress enacted § 441a (a)(1)(C) in part to prevent circumvention of the very limitations

---

[17] *Amicus* American Civil Liberties Union suggests that § 441a (a)(1)(C) would violate the First Amendment if construed to limit the amount individuals could jointly expend to express their political views. We need not consider this hypothetical application of the Act. The case before us involves the constitutionality of § 441a (a)(1)(C) as it applies to contributions to multicandidate political committees. Under the statute, these committees are distinct legal entities that annually receive contributions from over 50 persons and make contributions to 5 or more candidates for federal office. 2 U. S. C. § 441a (a)(4). Contributions to such committees are therefore distinguishable from expenditures made jointly by groups of individuals in order to express common political views.

on contributions that this Court upheld in *Buckley*.[18]   Under
the Act, individuals and unincorporated associations such as
CMA may not contribute more than $1,000 to any single
candidate in any calendar year. 2 U. S. C. § 441a (a)(1)
(A). Moreover, individuals may not make more than
$25,000 in aggregate annual political contributions. 2
U. S. C. § 441a (a)(3). If appellants' position—that Con-
gress cannot prohibit individuals and unincorporated associa-
tions from making unlimited contributions to multicandidate
political committees—is accepted, then both these contribu-
tion limitations could be easily evaded.   Since multicandi-
date political committees may contribute up to $5,000 per
year to any candidate, 2 U. S. C. § 441a (a)(2)(A), an indi-
vidual or association seeking to evade the $1,000 limit on
contributions to candidates could do so by channelling funds
through a multicandidate political committee.   Similarly, in-
dividuals could evade the $25,000 limit on aggregate annual
contributions to candidates if they were allowed to give un-
limited sums to multicandidate political committees, since
such committees are not limited in the aggregate amount
they may contribute in any year.[19]   These concerns prompted

[18] The Conference Report on the provision in the 1976 amendments
to the Act that became § 441a (a)(1)(C) specifically notes:

"The conferees' decision to impose more precisely defined limitations on
the amount an individual may contribute to a political committee, other
than a candidate's committees, and to impose new limits on the amount
a person or multicandidate committee may contribute to a political com-
mittee, other than candidates' committees, is predicated on the following
considerations: first, these limits restrict the opportunity to circumvent
the $1,000 and $5,000 limits on contributions to a candidate; second, these
limits serve to assure that candidates' reports reveal the root source of the
contributions the candidate has received; and third, these limitations mini-
mize the adverse impact on the statutory scheme caused by political com-
mittees that appear to be separate entities pursuing their own ends, but are
actually a means for advancing a candidate's campaign." H. R. Conf.
Rep. No. 94–1057, pp. 57–58 (1976).

[19] Appellants suggest that their First Amendment concerns would be
satisfied if this Court declared § 441a (a)(1)(C) unconstitutional to the

Congress to enact § 441a (a)(1)(C), and it is clear that this provision is an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley*.[20]

extent that it restricts CMA's right to contribute administrative support to CALPAC. The Act defines "contribution" broadly to include

"any gift, subscription, loan, advance, or deposit of money or anything of value . . . or . . . the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 2 U. S. C. §§ 431 (8)(A)(i), (ii) (1976 ed., Supp. III).

Thus, contributions for administrative support clearly fall within the sorts of donations limited by § 441a (a)(1)(C). Appellants contend, however, that because these contributions are earmarked for administrative support, they lack any potential for corrupting the political process. We disagree. If unlimited contributions for administrative support are permissible, individuals and groups like CMA could completely dominate the operations and contribution policies of independent political committees such as CALPAC. Moreover, if an individual or association was permitted to fund the entire operation of a political committee, all moneys solicited by that committee could be converted into contributions, the use of which might well be dictated by the committee's main supporter. In this manner, political committees would be able to influence the electoral process to an extent disproportionate to their public support and far greater than the individual or group that finances the committee's operations would be able to do acting alone. In so doing, they could corrupt the political process in a manner that Congress, through its contribution restrictions, has sought to prohibit. We therefore conclude that § 441a (a)(1)(C) applies equally to all forms of contributions specified in § 431 (8)(A), and assess appellants' constitutional claims from that perspective.

[20] We also reject appellants' contention that even if § 441a (a)(1)(C) is a valid means by which Congress could seek to prevent circumvention of the other contribution limitations embodied in the Act, it is superfluous and therefore constitutionally defective because other antifraud provisions in the Act adequately serve this end. See, *e. g.*, 2 U. S. C. §§ 441a (a)(7), 441a (a)(8). Because we conclude that the challenged limitation does not restrict the ability of individuals to engage in protected political advocacy, Congress was not required to select the least restrictive means of protecting the integrity of its legislative scheme. Instead, Congress

## IV

Appellants also challenge the restrictions on contributions to political committees on the ground that they violate the equal protection component of the Fifth Amendment. Under the statute, corporations and labor unions may pay for the establishment, administration, and solicitation expenses of a "separate segregated fund to be utilized for political purposes." 2 U. S. C. § 441b (b)(2)(C). Contributions by these groups to such funds are not limited by the statute. 2 U. S. C. § 431 (8)(B)(vi) (1976 ed., Supp. III). Appellants assert that a corporation's or a union's contribution to its segregated political fund is directly analogous to an unincorporated association's contributions to a multicandidate political committee. Thus, they conclude that because contributions are unlimited in the former situation, they cannot be limited in the latter without violating equal protection.

We have already concluded that § 441a (a)(1)(C) does not offend the First Amendment. In order to conclude that it nonetheless violates the equal protection component of the Fifth Amendment, we would have to find that because of this provision the Act burdens the First Amendment rights of persons subject to § 441a (a)(1)(C) to a greater extent than it burdens the same rights of corporations and unions, and that such differential treatment is not justified. We need not consider this second question—whether the discrimination alleged by appellants is justified—because we find no such discrimination. Appellants' claim of unfair treatment ignores the plain fact that the statute as a whole imposes far *fewer* restrictions on individuals and unincorporated associations than it does on corporations and unions. Persons subject to the restrictions of § 441a (a)(1)(C) may make unlimited expenditures on political speech; corpora-

could reasonably have concluded § 441a (a)(1)(C) was a useful supplement to the other antifraud provisions of the Act. Cf. *Buckley* v. *Valeo*, 424 U. S., at 27–28 (rejecting contention that effective bribery and disclosure statutes eliminated need for contribution limitations).

tions and unions, however, may make only the limited contributions authorized by § 441b (b)(2). Furthermore, individuals and unincorporated associations may contribute to candidates, to candidates' committees, to national party committees, and to all other political committees while corporations and unions are absolutely barred from making any such contributions. In addition, multicandidate political committees are generally unrestricted in the manner and scope of their solicitations; the segregated funds that unions and corporations may establish pursuant to § 441b (b)(2)(C) are carefully limited in this regard. §§ 441b (b)(3), 441b (b) (4). The differing restrictions placed on individuals and unincorporated associations, on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process. Appellants do not challenge any of the restrictions on the corporate and union political activity, yet these restrictions entirely undermine appellants' claim that because of § 441a (a)(1)(C), the Act discriminates against individuals and unincorporated associations in the exercise of their First Amendment rights. Cf. *Buckley*, 424 U. S., at 95–99.

Accordingly, we conclude that the $5,000 limitation on the amount that persons may contribute to multicandidate political committees violates neither the First nor the Fifth Amendment. The judgment of the Court of Appeals is therefore affirmed.

*So ordered.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Parts I, II, and IV of JUSTICE MARSHALL's opinion which, to that extent, becomes an opinion for the Court.

I write separately, however, to note my view of appellants' First Amendment claims. Part III of the opinion appears to

rest on the premise that the First Amendment test to be applied to contribution limitations is different from the test applicable to expenditure limitations. I do not agree with that proposition. Although I dissented in part in *Buckley* v. *Valeo,* 424 U. S. 1, 290 (1976), I am willing to accept as binding the Court's judgment in that case that the contribution limitations challenged there were constitutional. *Id.,* at 23–38. But it does not follow that I must concur in the plurality conclusion today, *ante,* at 196, that political contributions are not entitled to full First Amendment protection. It is true that there is language in *Buckley* that might suggest that conclusion, see, *e. g.,* 424 U. S., at 20–23, and it was to such language that I referred when I suggested in my dissent that the Court had failed to make a principled constitutional distinction between expenditure and contribution limitations. *Id.,* at 290. At the same time, however, *Buckley* states that "contribution and expenditure limitations both implicate fundamental First Amendment interests," *id.,* at 23, and that "governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny,' " *id.,* at 25, quoting *NAACP* v. *Alabama,* 357 U. S. 449, 460–461 (1958). Thus, contribution limitations can be upheld only "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." 424 U. S., at 25. See Note, The Unconstitutionality of Limitations on Contributions to Political Committees in the 1976 Federal Election Campaign Act Amendments, 86 Yale L. J. 953, 961–962 (1977).

Unlike the plurality, I would apply this "rigorous standard of review," 424 U. S., at 29, to the instant case, rather than relying on what I believe to be a mistaken view that contributions are "not the sort of political advocacy . . . entitled to full First Amendment protection." *Ante,* at 196. Appellees claim that 2 U. S. C. § 441a (a)(1)(C) is justified by the gov-

ernmental interest in preventing apparent or actual political corruption. That this interest is important cannot be doubted. It is a closer question, however, whether the statute is narrowly drawn to advance that interest. Nonetheless, I conclude that contributions to multicandidate political committees may be limited to $5,000 per year as a means of preventing evasion of the limitations on contributions to a candidate or his authorized campaign committee upheld in *Buckley*. The statute challenged here is thus analogous to the $25,000 limitation on total contributions in a given year that *Buckley* held to be constitutional. 424 U. S., at 38.

I stress, however, that this analysis suggests that a different result would follow if § 441a (a)(1)(C) were applied to contributions to a political committee established for the purpose of making independent expenditures, rather than contributions to candidates. By definition, a multicandidate political committee like CALPAC makes contributions to five or more candidates for federal office. § 441a (a)(4). Multicandidate political committees are therefore essentially conduits for contributions to candidates, and as such they pose a perceived threat of actual or potential corruption. In contrast, contributions to a committee that makes only independent expenditures pose no such threat. The Court repeatedly has recognized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association . . . ." *NAACP* v. *Alabama,* 357 U. S., at 460. By pooling their resources, adherents of an association amplify their own voices, see *Buckley* v. *Valeo,* 424 U. S., at 22; the association "is but the medium through which its individual members seek to make more effective the expression of their own views." *NAACP* v. *Alabama,* 357 U. S., at 459. Accordingly, I believe that contributions to political committees can be limited only if those contributions implicate the governmental interest in preventing actual or potential corruption, and if the limitation is no broader than necessary to achieve that interest. Because this narrow test

is satisfied here, I concur in the result reached in Part III of JUSTICE MARSHALL's opinion.

JUSTICE STEWART, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

In § 313 of the Federal Election Campaign Act of 1971, 2 U. S. C. § 437g (1976 ed., Supp. III), Congress created an elaborate system for the enforcement of the Act. That system may be summarized as follows:

If the Commission becomes aware of a possible violation of the Act, it must notify the person responsible for the violation (who is referred to in the Act as the respondent). 2 U. S. C. § 437g (a)(2) (1976 ed., Supp. III). After investigating the possible violation, the Commission must notify the respondent of any recommendation made by the Commission's General Counsel that the Commission decide whether there is probable cause to believe that the respondent has violated, or is about to violate, the Act. If the Commission determines that there is probable cause, it must attempt, for at least 30 but not more than 90 days, "to correct or prevent such violation by informal methods of conference, conciliation, and persuasion . . . ." § 437g (a)(4)(A)(i). (If the probable-cause determination is made within 45 days before an election, the Commission need seek conciliation for only 15 days. § 437g (a)(4)(A)(ii).) If conciliation fails, the Commission may institute a civil action for relief in an appropriate United States district court. § 437g (a)(6)(A) (1976 ed. and Supp. III). Any judgment of that court may be appealed to the appropriate court of appeals, and the judgment of the court of appeals is subject to review by this Court upon certiorari or certification. § 437g (a)(9). Section 437g (a)(10) provides that "[a]ny action brought under this subsection shall be advanced on the docket of the court in which filed, and put ahead of all other actions (other than other actions brought under this subsection or under section 437h of this title)."

A number of Members of Congress believed that the Act raised significant constitutional issues, and Congress concluded that such issues ought to be expeditiously resolved. Consequently, Congress authorized "such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act." 2 U. S. C. § 437h (a) (1976 ed., Supp. III). To assure quick and authoritative resolution of these constitutional issues, Congress established two extraordinary procedures. First, "[t]he district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." *Ibid.* Second, "any decision on a matter certified under subsection (a) of this section shall be reviewable by appeal directly to the Supreme Court of the United States." § 437h (b). These procedures are to be accomplished with special promptness: "It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a) of this section." § 437h (c).

The Court today holds that a person who has received formal notification of an impending § 437g enforcement proceeding may nevertheless bring an action under § 437h raising precisely the same constitutional issues presented in the § 437g proceeding. This holding interferes, I think, with the proper enforcement of the Act and with the sound functioning of the federal courts in ways that Congress cannot have intended.

Although neither the language of the Act nor its legislative history directly addresses the issue resolved by the Court's holding, the structure of the Act itself expresses Congress' intent that § 437h is not to be available as a means of thwarting a § 437g enforcement proceeding. The Act provides for two separate kinds of proceedings with two separate pur-

poses. The first proceeding serves to prevent violations of the Act. The second makes possible prompt challenges to the constitutionality of the Act, more or less in the abstract.

Because the proceedings serve different purposes, Congress instituted separate sets of procedures tailored to the purposes of each proceeding. Thus Representative Hays—the chairman of the House Committee responsible for the bill—stated during debate: "The delicately balanced scheme of procedures and remedies set out in the act is intended to be the exclusive means for vindicating the rights and declaring the duties stated therein." 120 Cong. Rec. 35134 (1974). In particular, in § 437g Congress balanced in extensive detail the public's interest in an expeditious resolution of any § 437g question against the respondent's interest in fair procedures. Congress accordingly (1) specified the periods of time in which § 437g proceedings must be accomplished, (2) directed that § 437g cases need only be heard by ordinarily constituted panels in the courts of appeals, and (3) limited access to this Court to those cases certified to the Court and those cases which the Court chooses to review.

Under the Court's holding today, Congress' assessment of each of the cautiously limited rights contained in § 437g can easily be upset, to the detriment of the strong interest in a prompt resolution of a § 437g proceeding. First, Congress' requirement of a timely resolution of an enforcement proceeding can be disrupted by a respondent's decision to engraft a § 437h proceeding onto a § 437g action. If, in response to such a graft, the § 437g action is stayed pending the outcome of the § 437h proceeding, delay will obviously result. If the § 437g action is not stayed, delay may often be caused by the necessity of redoing work in light of the decision reached by the § 437h courts. Nor will the fact that an appeal has already been had on the abstract constitutional principle make up for some of that lost time, since an appeal on the question of whether the constitutional principle was correctly applied will still be available under § 437g.

Second, by invoking § 437h, a § 437g respondent will be able to arrogate to himself the extraordinary—perhaps unique—right to an immediate hearing by a court of appeals sitting en banc. (Under Rule 35 of the Federal Rules of Appellate Procedure, a case is ordinarily heard en banc only after a three-judge panel has heard it and after a majority of the circuit judges in active service have decided that consideration by the full court is necessary to assure the uniformity of the circuit's decisions or that the proceeding involves a question of exceptional importance.) Third, by invoking § 437h, the § 437g respondent can similarly arrogate to himself the unusual right of direct appeal to this Court.

Not only will Congress' careful balancing of interests thus be undone by today's holding, but what Representative Hays referred to as the Act's "comprehensive system of civil enforcement," 120 Cong. Rec. 35134 (1974), is likely to be impaired by the strain placed on the Federal Election Commission by the necessity of carrying on two lines of litigation where the Act envisions but one. I see no indication that by adopting § 437h—which its author, Senator Buckley, said "merely provides for the expeditious review of the constitutional questions I have raised," 120 Cong. Rec. 10562 (1974)— Congress intended either to expand the rights of § 437g respondents or to contract the Government's ability to stop violations of the Act promptly.*

---

*The Court's opinion suggests that any approach other than its own would "remove a whole category of constitutional challenges from the purview of § 437h, thereby significantly limiting the usefulness of that provision." *Ante,* at 191. However, that "whole category" consists only of those few challenges raised by § 437g respondents who did not raise the challenge before the § 437g proceeding began. Any such challenge, of course, will not go unresolved, but will be promptly handled according to the method Congress provided under § 437g for Federal Election Campaign Act issues raised after proceedings have begun.

The Court's opinion also suggests that the fact that § 437g proceedings are to be put ahead of all other actions except "other actions brought

In addition, I think the Court errs in construing with such liberality the jurisdictional scope of an Act that places uncommonly heavy burdens on the federal court system. Litigants who can invoke both § 437g and § 437h can impose on the courts piecemeal adjudication, with all its dangers and disadvantages: Section 437h litigation will often occur without the firm basis in a specific controversy and without the fully developed record which should characterize all litigation and which will generally characterize § 437g proceedings. And § 437h litigation is all too likely to decide questions of constitutional law which might have been avoided by a decision on a narrower ground in a § 437g proceeding.

I cannot believe that Congress intended to require every federal court of appeals to hear en banc every constitutional issue arising in a § 437g proceeding. En banc hearings drain large amounts of judicial time, and since they require the summoning together in the larger federal appellate courts of some two dozen circuit judges, they are cumbersome as well. As the Court of Appeals said in the instant case, "if mandatory en banc hearings were multiplied, the effect on the calendars of this court as to such matters and as to all other business might be severe and disruptive." 641 F. 2d 619, 632. I would hold that, where a respondent has been formally notified of a § 437g enforcement proceeding, the respondent may not use the issues raised in that enforcement proceeding as a basis for an action under § 437h. I would also hold that the individual members of the respondent associations in the instant case fall within the same bar, given the identity of the interests of the associations and their

---

under this subsection or under section 437h" somehow supports its holding. There is no evidence that this provision of the statute contemplates more than that a court might have a wholly separate § 437h case on its docket at the time that a § 437g action is filed, and there is no evidence that Congress intended "other actions brought . . . under section 437h" to include a § 437h action which is in practical effect the same case as the § 437g action.

members.  Consequently, I would hold that the District Court should not have certified this case to the Court of Appeals, and that the Court of Appeals was without jurisdiction to decide it.

Accordingly, I would dismiss this appeal for want of jurisdiction.