274 F.3d 1262 (9th Cir. 2001)
 THE LINCOLN CLUB OF ORANGE COUNTY, A CALIFORNIA NON-PROFIT MUTUAL BENEFIT CORPORATION ON BEHALF OF ITSELF AND ITS MEMBERS; THE LINCOLN CLUB OF ORANGE COUNTY STATE PAC; THE LINCOLN CLUB OF ORANGE COUNTY INDEPENDENT EXPENDITURES PAC, PLAINTIFFS-APPELLANTS,
v.
CITY OF IRVINE, CALIFORNIA, A MUNICIPAL CORPORATION, DEFENDANT-APPELLEE.
 No. 00-56444
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 6, 2001
Filed Dec. 20, 2001
 
 John C. Eastman, The Claremont Institute Center for Constitutional Jurisprudence, Orange, California, for the plaintiffs-appellants.
 Joel D. Kuperberg, Rutan & Tucker, Costa Mesa, California, for the defendant-appellee.
 Appeal from the United States District Court for the Central District of California Alicemarie H. Stotler, District Judge, Presiding D.C. No. CV-99-01262 AHS
 Before: Alfred T. Goodwin, J. Clifford Wallace and Sidney R. Thomas, Circuit Judges.
 
 Goodwin, Circuit Judge
 
 1
 The Lincoln Club of Orange County and its affiliated political action committees ["The Lincoln Club"] brought an action for declaratory and injunctive relief in the district court challenging the constitutionality of section 1-2-404(B) of the City of Irvine's ["Irvine"] Campaign Financing Law. The district court granted Irvine's motion for summary judgment. The Lincoln Club appeals. We reverse and remand.
 
 Facts and Procedural History
 
 2
 Section 1-2-404(B) ["the Ordinance"] of Irvine's Campaign Financing Law imposes a maximum limit on the amount of campaign contributions that a person or committee may receive from a single source during an election campaign. The Ordinance provides that:
 
 
 3
 Any person, including any committee, that makes any independent expenditure during an election cycle in support of or opposition to any City candidate, shall not accept any contribution(s) from any person which exceeds in the aggregate the amount set forth in this section for that election cycle.
 
 
 4
 The contribution limit in place for the two-year election cycle ending with the November 2000 election was $320. A person or committee is subject to civil and criminal prosecution for violation of the Ordinance if it accepts during an election cycle contributions from any person that in the aggregate exceed $320, and in the same election cycle makes independent expenditures in support of or in opposition to candidates for office in an Irvine municipal election.
 
 
 5
 The Lincoln Club is a nonprofit corporation that participates in the electoral process through two affiliated political action committees ["PACs"]: the Lincoln Club of Orange County State PAC and the Lincoln Club of Orange County Independent Expenditures PAC. The Lincoln Club and its affiliated PACs derive their resources from annual membership dues of $2,000 per member. In the November 1998 and 2000 Irvine municipal elections, the Lincoln Club was prohibited from making any independent expenditures in support of or in opposition to candidates because the Lincoln Club's annual dues exceeded the $320 limit imposed by the Ordinance. The Lincoln Club's annual dues are deemed to be "contributions" for purposes of the Ordinance because the dues are paid to political committees that make independent expenditures during political elections.
 
 
 6
 The Lincoln Club sued Irvine under 42 U.S.C. §§ 1983 alleging that the Ordinance impermissibly restricted the Lincoln Club's First Amendment rights of free speech and association. The parties executed a Joint Statement of Undisputed Facts and filed cross motions for summary judgment. After a hearing on the parties' cross-motions, the district court granted Irvine's motion for summary judgment. The court refused to apply a strict level of constitutional scrutiny to the Ordinance, concluding that "[p]olitical contributions to independent expenditure committees warrant lesser constitutional protection and therefore lesser constitutional scrutiny than independent expenditures." The district court held that the Ordinance was constitutional because it was closely drawn to further Irvine's sufficiently important interests in avoiding corruption and the appearance of corruption, and preserving the integrity of the electoral system by preventing contributors from circumventing Irvine's comprehensive regulation of campaign contributions.
 
 Level of Scrutiny
 
 7
 We begin by considering whether the district court erred by failing to apply strict scrutiny to the Ordinance. The seminal Supreme Court case in the realm of campaign finance regulation is Buckley v. Valeo, 424 U.S. 1 (1976), where the Court upheld as constitutional the Federal Election Campaign Act's limitations on contributions to candidates and struck down as unconstitutional the Act's limitations on independent expenditures.
 
 
 8
 Subsequent Supreme Court decisions have construed Buckley as requiring strict scrutiny of limitations on independent expenditures and lesser constitutional scrutiny of limitations on contributions. See Fed. Election Comm'n v. Colo. Repub. Fed. Campaign Comm., 121 S.Ct. 2351, 2358 (2001) (Colorado II) (observing that ever since Buckley the Court has understood that limits on expenditures deserve closer scrutiny than restrictions on contributions); Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 387 (2000) (construing Buckley as providing that contribution limitations warrant less compelling justification than expenditure limitations); Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60 (1986) ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending"). We have also construed Buckley as requiring different levels of constitutional scrutiny for expenditure and contribution limitations. See VanNatta v. Keisling, 151 F.3d 1215, 1220 (9th Cir. 1998) (stating that "restrictions on contributions . . . are subjected to less exacting scrutiny than restrictions on independent expenditures"); Serv. Employees Int'l Union v. Fair Political Practice Comm'n, 955 F.2d 1312, 1322 (9th Cir. 1992) (observing that the Supreme Court has applied strict scrutiny in assessing the constitutionality of expenditure limitations but applied a "somewhat less stringent test than strict scrutiny" in assessing constitutionality of contribution limitations).
 
 
 9
 The Supreme Court has also explained the reasons underlying its disparate treatment of contributions vis-a-vis expenditures. In Buckley the Court reasoned that"[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." Buckley, 424 U.S. at 19. The Court concluded that expenditure limitations place substantial restraints on both political speech and association.
 
 
 10
 By contrast, the Buckley court found that contribution limitations do not place a substantial restraint on protected political speech and association. Rather, the Court found that "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." Buckley, 424 U.S. at 20 (emphasis added). The Court justified its position that contribution limits impose only a marginal restriction on protected speech by reasoning that contributions are merely speech by proxy, and not full-fledged speech: "[w]hile contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." Buckley, 424 U.S. at 21.
 
 
 11
 Nearly all of the Supreme Court and Ninth Circuit cases that have considered the constitutionality of contribution limitations, however, have done so in the context of contributions to candidates: neither the Supreme Court nor this Court has squarely confronted a campaign finance law that limits contributions to independent expenditure committees, as does Irvine's Ordinance. Although it is clear that expenditure limitations are subject to strict scrutiny and contribution limitations are subject to less than strict scrutiny, our case law has not described the level of scrutiny appropriate for an Ordinance that acts as both an expenditure and a contribution limitation.
 
 Discussion
 
 12
 We begin our inquiry by recognizing that the level of constitutional scrutiny that we apply to a statutory restriction on political speech and associational freedoms is dictated by both the intrinsic strength of, and the magnitude of the burden placed on, the speech and associational freedoms at issue. If the Ordinance places a severe burden on fully protected speech and associational freedoms, we apply strict scrutiny. See Fed. Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 496 (1985) ("NCPAC"); Buckley, 424 U.S. at 44-45. If the Ordinance places only a minimal burden on fully protected speech and associational freedoms, or if the speech and associational freedoms are not fully protected under the First Amendment, we apply a lower level of constitutional scrutiny. See Shrink Missouri, 528 U.S. at 38688; Buckley, 424 U.S. at 20-21, 25.
 
 
 13
 The Lincoln Club contends that the Ordinance warrants strict scrutiny because, although the Ordinance facially limits only contributions, it has the purpose and effect of barring expenditures by independent expenditure committees. The Lincoln Club further contends that the traditional motivation for lower level scrutiny, i.e. that contributions to candidates are merely speech by proxy of the candidate himself and that contributions to candidates pose the danger of quid pro quo corruption, are not present in the context of contributions to independent expenditure committees.
 
 
 14
 In response, Irvine contends that the district court properly applied a lower level of constitutional scrutiny here because the challenged Ordinance regulates contributions, not expenditures. Irvine further argues that the distinction between contributions to candidates and contributions to independent expenditure committees is irrelevant to the standard of review. According to Irvine, "it is the nature of the contribution, and not the identity of the recipient, that creates the lower level of review."Irvine's Ordinance clearly places a limit on contributions to independent expenditure committees. Although such a restriction burdens speech and associational freedoms, under Buckley and its progeny such a restriction does not place a severe burden on protected speech and associational freedoms. This is because Buckley does not consider political contributions to be fully protected political speech. Under Buckley, political contributions are merely speech by proxy because "the transformation of contributions into political debate involves speech by someone other than the contributor." Buckley, 424 U.S. at 21. Viewed in the light of the speech by proxy rationale, The Lincoln Club's contributors (i.e. its dues-paying members) are merely engaging in speech by proxy because it is the Lincoln Club, and not the contributors themselves, that transforms the members' contributions into political debate. Since the contributions themselves are not fully-protected political speech under Buckley and its progeny, the Ordinance's contribution limit, standing alone, does not warrant strict scrutiny.
 
 
 15
 However, the Ordinance does not merely restrict contributions. It also restricts expenditures by barring an independent expenditure committee from making any independent expenditures whatsoever if the source of the committee's money is membership dues that exceed the Ordinance's prescribed maximum. This feature of the Ordinance burdens protected speech and associational interests in two important ways. First, if The Lincoln Club maintains its present organizational structure, it will continue to be precluded from making any political expenditures whatsoever in Irvine municipal elections. Second, if The Lincoln Club chooses to comply with the Ordinance, it will have to make dramatic changes to its organizational structure. In order to comply with the Ordinance, The Lincoln Club would need to reduce its annual dues from $2,000 to $160 (of the $320 currently permitted under the Ordinance per 2 year election cycle). If The Lincoln Club were to reduce its annual dues from $2,000 to $160 in order to accommodate the Ordinance's $320 limit, The Lincoln Club would also need to expand its membership from the current level of approximately 300 members to approximately 3,750 members in order to maintain the same funding level that it currently enjoys. The Ordinance's expenditure limitation is a double-edged sword, placing a substantial burden on protected speech (i.e. barring expenditures) while simultaneously threatening to burden associational freedoms (i.e. by requiring a restructuring of The Lincoln Club). We conclude that such substantial burdens on protected speech and associational freedoms necessitate the application of strict scrutiny to the Ordinance.
 
 
 16
 Application of Strict Scrutiny to Irvine's Ordinance
 
 
 17
 Under strict scrutiny, we ask whether the Irvine Ordinance is narrowly tailored to serve a compelling governmental interest. See McIntyre v. Ohio Elections Comm'n , 514 U.S. 334, 347 (1995); NCPAC, 470 U.S. at 496; First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 786 (1978). In the context of campaign finance law, the Supreme Court has recognized that government has a valid constitutional interest in avoiding corruption or the appearance of corruption. See Colorado II, 121 S.Ct. at 2366; Shrink Missouri, 528 U.S. at 388-89; Bellotti, 435 U.S. at 788, n.26; Buckley, 424 U.S. at 25-26.
 
 
 18
 The Lincoln Club contends that Irvine's "anti-corruption" interest is not implicated by the Ordinance because the Ordinance does not place a limitation on contributions to candidates, but rather it places a limitation on contributions to independent expenditure committees. The Lincoln Club contends that this distinction is crucial because, unlike contributions to candidates, contributions to independent expenditure committees do not implicate the government's interest in preventing corruption or the appearance thereof. By definition, an independent expenditure committee neither contributes money to a candidate nor coordinates expenditures with a candidate. See Cal. Gov. Code §§ 82031. According to The Lincoln Club, this "chasm" separating a political candidate from both contributions to and expenditures by an independent expenditure committee lessens the likelihood of political corruption and the appearance thereof.
 
 
 19
 The Lincoln Club supports its argument with language from Buckley and NCPAC wherein the Court explained that independent expenditures do not implicate the government's interest in preventing corruption and the appearance of corruption. In NCPAC, for example, the Court stated:
 
 
 20
 It is of course hypothetically possible here, as in the case of the independent expenditures forbidden in Buckley, that candidates may take notice of and reward those responsible for PAC expenditures by giving official favors to the latter in exchange for the supporting messages. But here, as in Buckley, the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that the expenditures will be given as a quid pro quo for improper commitments from the candidate.
 
 
 21
 NCPAC, 470 U.S. at 498; see also Buckley , 424 U.S. at 47.
 
 
 22
 The Lincoln Club further relies on Justice Blackmun's concurring opinion in California Med. Ass'n v. Fed. Election Comm'n, 453 U.S. 182 (1981) (CMA). In contrasting multicandidate political committees (i.e. committees that contribute money directly to a candidate) with independent expenditure committees, Justice Blackmun observed that "[m]ulticandidate political committees are therefore essentially conduits for contributions to candidates, and as such they pose a perceived threat of actual or potential corruption. In contrast, contributions to a committee that makes only independent expenditures pose no such threat. " CMA, 453 U.S. at 203 (emphasis added).
 
 
 23
 Although The Lincoln Club's argument has some persuasive force, we note that the proffered language in both Buckley and NCPAC dealt only with independent expenditures. Neither discussion specifically addressed the factual predicate that we address here: contributions to an independent expenditure committee.
 
 
 24
 Further, we do not believe that Justice Blackmun's discussion of independent expenditure committees is particularly persuasive. It seems highly unlikely that a candidate for local office would not notice the identities of the individual contributors (i.e. The Lincoln Club's dues-paying members) who made contributions to the independent expenditure committee that independently spent money on the candidate's behalf. This situation creates, at the very least, the possibility of an appearance of improper political influence. This situation could also give rise to the appearance that contributors are evading valid limitations on contributions to candidates by funneling their contributions to independent expenditure committees, rather than directly to candidates, knowing full well that their contributions will be spent (albeit "independently") on behalf of the candidates that they seek to support. See Colorado II, 121 S.Ct. at 2366 (recognizing that circumvention of valid contribution limits is a valid theory of corruption). Further, this situation could give rise to political quid pro quos, with candidates being more inclined to provide favors and attention to those individuals who contributed large sums to the candidate's campaign through the independent expenditure committee intermediary. Therefore, we conclude that the government's interest in avoiding corruption or the appearance thereof is implicated in the context of contributions to independent expenditure committees.
 
 
 25
 Nevertheless, it is unclear whether the Irvine Ordinance actually "achieves" or "furthers" Irvine's interest in avoiding political corruption and the appearance thereof. At the district court level the Lincoln Club and Irvine disagreed over just what exactly Irvine's purpose was in enacting the Ordinance. The parties continue to disagree. Irvine contends that it enacted the Ordinance in order to prevent corruption and to avoid the circumvention of its existing campaign finance laws. The Lincoln Club contends that Irvine's only purpose in enacting the Ordinance was to level the playing field in Irvine elections. The Lincoln Club supports this contention by looking to the Ordinance's codified legislative purpose, which reads:
 
 
 26
 The purpose of this chapter is to ensure an environment in the City of Irvine wherein all candidates for elective office are placed on an equal plan (sic) relative to the amount of campaign contributions received by them, and further to ensure that the amount contributed by any person does not materially influence the outcome of any election.
 
 
 27
 The Lincoln Club correctly observes that the purpose of "leveling the playing field" is insufficient to justify governmental restrictions on campaign financing. See Buckley, 424 U.S. at 48-49; see also NCPAC, 470 U.S. at 496-97 (observing that "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances").
 
 
 28
 A district court may grant summary judgment only if there is no genuine issue as to any material fact. See Levin v. Knight, 780 F.2d 786, 787 (9th Cir. 1986). Because the parties disputed Irvine's purpose in enacting the Ordinance, and because Irvine's purpose in enacting the ordinance is a material fact, we conclude that the district court erred by granting summary judgment in favor of Irvine. We therefore reverse the judgment of the district court and remand for further factual findings and reconsideration in light of the appropriate standard of constitutional scrutiny.
 
 
 29
 REVERSED and REMANDED.