**FEDERAL ELECTION COMMISSION,**
**Plaintiff,**

v.

**CALIFORNIA MEDICAL ASSOCIATION**
**and California Medical Political Action**
**Committee, Defendants.**

**No. C–79–1197 WHO.**

United States District Court,
N. D. California.

Oct. 21, 1980.

Charles N. Steele, Gen. Counsel, Federal Election Commission, Washington, D. C., for plaintiff.

Hassard, Bonnington, Rogers & Huber, Rick C. Zimmerman, San Francisco, Cal., for defendant.

## OPINION

ORRICK, District Judge.

This is a civil enforcement action brought by the Federal Election Commission ("the FEC") against the California Medical Asso-

ciation ("CMA") and the California Medical Political Action Committee ("CALPAC") for alleged violations during 1976,[1] 1977, and 1978 of the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.* (hereinafter cited as "FECA"). The FEC claims that CMA made contributions to CALPAC in excess of $5,000 during each of those years, in violation of 2 U.S.C. § 441a(a)(1)(C), and that CALPAC knowingly accepted such contributions, in violation of 2 U.S.C. § 441a(f). The matter was tried to the Court upon stipulated facts as well as supplementary testimonial and documentary evidence. For the reasons set forth below, the Court holds that CMA and CALPAC have violated the cited statutory provisions and that judgment should be entered in favor of the FEC.

I

CMA is an unincorporated membership organization of approximately 25,000 individual physicians residing in California. Stipulations to findings of fact (hereinafter cited as "Stipulation") ¶ 2; testimony of Willis Babb. Prior to May 11, 1976, the date on which the statutory provisions in question took effect, CMA formed CALPAC, a nonpartisan political committee. Stipulation ¶¶ 3, 4. CALPAC is registered with the FEC as a political committee and has reported its affiliation with CMA, in compliance with 2 U.S.C. §§ 433, 431(4) and (7). Stipulation ¶¶ 3, 4. CMA directly pays CALPAC's administrative and operating expenses, including salaries, rent, office supplies, postage, computer services, and travel costs. Stipulation ¶ 5. In addition to such in–kind support provided by CMA, CALPAC receives cash contributions and dues from the approximately 7,000–10,000

physicians and their families who constitute its membership. Testimony of Babb and Allen Pross.

CALPAC makes contributions to and expenditures on behalf of candidates in state and federal elections. CALPAC also sponsors conferences and workshops to encourage doctors to get involved in the political process, organizes lobbying expeditions to Washington, D.C., and spends a fair amount of time and money soliciting new members. Testimony of Pross, Babb, and Bradley Davis. CALPAC is run formally by a board of directors, which meets at least annually. Its key policy-making body is an executive committee composed of CALPAC's principal officers. Neither CMA nor the individual contributors to CALPAC specify the uses to which their donations should be put. Such decisions are left to CALPAC's discretion. The recipients and size of CALPAC's contributions to political candidates are determined by its executive committee, acting upon the recommendations of its federal and state candidate selection committees. Pross testimony. The following table indicates the value of CMA's in–kind contributions to CALPAC during 1976, 1977, and 1978, and the total contributions made by CALPAC to federal and state candidates during each of those years.

Table 1

| | In-Kind Contributions from CMA to CALPAC | Contributions from CALPAC to: | |
|---|---|---|---|
| | | federal candidates | state candidates |
| 1976 | $ 79,517 | $25,950 [2] | $145,685.07 |
| 1977 | 104,135 | 6,800 | 55,583.49 |
| 1978 | 134,981 | 21,300 | 329,134.30 |

1. The Federal Election Campaign Act was originally enacted in 1972, Pub.L. 92–225, 86 Stat. 11. After the Supreme Court struck down several of its provisions, *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), Congress enacted significant amendments in 1976, Pub.L. 94–283, 90 Stat. 478. The 1976 amendments, which include the provisions in issue here, took effect on May 11, 1976. Thus, all references to alleged violations during 1976 refer only to the period between May 11, 1976,

and December 31, 1976. The statute was again amended in 1980, Pub.L. 96–187.

2. As initially introduced into evidence, Stipulation ¶ 10 stated that CALPAC contributed $32,950 to "clearly identified candidates in federal elections" in 1976. At trial, the parties amended the Stipulation to note that $7,000 of that total was given to the Republican National Committee rather than to any clearly identified candidate.

Stipulation ¶¶ 6–8, 10–12.

In October and November, 1978, the FEC notified CMA and CALPAC first, that it had reason to believe, and second, that it had reasonable cause to believe, that they were violating the FECA because CMA was making and CALPAC was accepting contributions in excess of $5,000 per year. *See* former 2 U.S.C. § 437g(a)(2) and (5)(A) (1976). On April 19, 1979, the FEC determined that there was probable cause to believe that such violations had taken place during 1976, 1977, and 1978. *See* former 2 U.S.C. § 437g(a)(5)(B) (1976).

CMA and CALPAC, along with two individual members of CMA, then filed a declaratory judgment action. *California Medical Ass'n v. Federal Election Comm'n*, C–79–1089 WHO (filed May 7, 1979), *appellate decision on certified questions*, slip op. at 3371 (9th Cir., May 23, 1980) (hereinafter cited as "*CMA v. FEC*"). The doctors sought a declaration that the $5,000 limit on contributions by persons to political committees did not apply to in–kind contributions by unincorporated associations such as CMA and that, if it did, the statute was unconstitutional on its face as applied to CMA and CALPAC because it deprived them of their First Amendment right to free speech and their Fifth Amendment right to equal protection of the law. Two weeks after the doctors commenced their suit, the FEC filed this enforcement action.[3] The FEC sought declaratory and injunctive relief as well as the imposition of $5,000 civil penalties against each defendant. The defenses raised by CMA and CALPAC were virtually identical to their affirmative claims in the declaratory judgment action.

Pursuant to the procedures mandated by FECA, this Court certified to the Ninth Circuit the constitutional questions raised in the doctors' declaratory judgment action.

*See* 2 U.S.C. § 437h(a). While the parties presented those questions to the appellate court, they simultaneously conducted discovery and pretrial preparation in this enforcement action. Shortly before the scheduled commencement of trial, the parties filed cross–motions for summary judgment. At the oral argument on February 22, 1980, the Court deferred ruling on the summary judgment motions pending the development of a fuller factual record at trial. The trial then took place on March 17 and 18, 1980; three witnesses testified and seventy–five exhibits were admitted into evidence. On May 23, 1980, the Ninth Circuit issued its *en banc* decision in the declaratory judgment action. The court rejected the doctors' arguments, holding that the $5,000 limitation on contributions to political committees applies to in–kind contributions by unincorporated associations and that the statutory provisions which CMA and CALPAC are charged with violating do not infringe their constitutional rights.

## II

The Ninth Circuit's resolution of the difficult constitutional and statutory issues has substantially narrowed the scope of this case. The sole remaining issue is almost technical in nature: when contributions to a political committee are not earmarked for a particular use, and when a political committee uses such contributions for the purpose of influencing federal elections as well as for other purposes beyond FECA's regulatory embrace, how should it be determined whether the contributions exceed FECA's $5,000 limitation on aggregate annual contributions to a political committee?

The statutory section under which CMA has been charged prohibits any person from making "contributions" to any political committee which, in the aggregate, exceed

---

**3.** The FEC's complaint alleged three claims for relief. The first claim–that CMA and CALPAC violated the $5,000 annual limit on contributions to political committees–was the subject of the trial and of this Opinion. The second and third claims–that CALPAC's Statement of Organization filed with the FEC was deficient in that it did not list the Los Angeles County Physicians Committee ("LACPC") as an affiliated or connected organization, and that CALPAC improperly aggregated with LACPC its contributions to a federal candidate–were resolved by a Consent Order filed on January 18, 1980.

$5,000 per year.[4] 2 U.S.C. § 441a(a)(1)(C). "Contribution" is also the crucial term in the statutory section under which CALPAC has been charged: "No * * * political committee shall knowingly accept any contribution * * * in violation of the provisions of this section." 2 U.S.C. § 441a(f). The statute defines "contribution" first by listing the items included within the general definition and second by listing several exclusions from that definition. 2 U.S.C. § 431(8), formerly 2 U.S.C. § 431(e). The definitional provision that was in effect when the "contributions" in question were made and when this case was filed has since been amended. However, the amendments pertinent to the issues raised here merely simplified the definition without affecting its substantive scope. See H.Rep.No.96–422, 96th Cong., 1st Sess. 6–11, reprinted in [1979] U.S.Code Cong. & Ad.News, pp. 2860, 2864.[5] As currently phrased, the general inclusive definition of "contribution" is:

"(i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office ; or

(ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 2 U.S.C. § 431(8)(A) (emphasis added).[6]

4. The limitation on contributions to political committees established and maintained by national political parties is separately set at $20,-000 per year. 2 U.S.C. § 441a(a)(1)(B).

5. CMA and CALPAC contend that the recent amendments significantly changed the definition of "contribution." They rely on the fact that the definition in effect during 1976–1978 provided that the payment of a political committee's salary expenses was a contribution where the personal services were rendered "for any such purpose," presumably referring to the general definition of contribution as being made for the purpose of influencing the results of a federal election (or primary). Former 2 U.S.C. § 431(e)(4) and (e)(1) (1976). On the other hand, the amended definitional provision with respect to compensation for personal services rendered to a political committee simply refers to services rendered "for any purpose." 2 U.S.C. § 431(8)(A)(ii). The doctors cite no authority for their suggestion that the deletion of the word "such" represents a substantive modification of the definition. To the contrary, the legislative history of the 1980 amendments indicates that no substantive change was intended. The congressional committee report which accompanied the amendments mentions the addition and deletion of other phrases, but makes no mention of the deletion of "such." It is highly improbable that Congress would have highlighted minor amendments which made little or no substantive changes in the definition, while neglecting to note the more significant changes. See H.Rep.No.96–422, 96th Cong., 1st Sess. 6–11, reprinted in [1979] U.S.Cong. & Ad.News, pp. 2860–2864.

6. During the relevant time period (1976–1978), the general, inclusive definition of contribution was as follows:

"(e) "contribution"–

(1) means a gift, subscription, loan, advance, or deposit of money or anything of value made for the purpose of–

(A) influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party, or

(B) influencing the result of an election held for the expression of a preference for the nomination of persons for election to the office of President of the United States;

(2) means a written contract, promise, or agreement, whether or not legally enforceable, to make a contribution for such purposes;

(3) means funds received by a political committee from another political committee or other source;

(4) means the payment, by any person other than a candidate or a political committee, of compensation for the personal services of another person which are rendered to such candidate or political committee without charge for any such purpose, except that this paragraph shall not apply in the case of legal or accounting services rendered to or on behalf of the national committee of a political party (unless the person paying for such services is a person other than the regular employer of the individual rendering such services), other than services attributable to activities which directly further the election of a designated candidate or candidates to Federal office, nor shall this paragraph apply in the case of legal or accounting services rendered to or on behalf of a candidate or political committee solely for the purpose of insuring compliance with the provisions of this Act or chapter 95 or chapter 96 of Title 26 (unless the person paying for such services is a person other than the regular em-

The language suggests that whereas donations in the form of money or goods are contributions *if* given to a political committee for federal electioneering purposes, donations in the form of personal services (other than volunteer services, *see* 2 U.S.C. § 431(8)(B)(i)) are automatically deemed to be contributions. In this case, it is undisputed that CMA paid CALPAC's salary expenses in excess of $5,000 during each of the years in question. Stipulation ¶¶ 6–8 (1976–$40,398; 1977–$41,029; 1978–$59,-494). On that basis alone, it would be possible to find that the doctors violated the statutory limitation on contributions made to, and knowingly accepted by, a political committee. 2 U.S.C. §§ 441a(a)(1)(C) and 441a(f).

■ However, the Court need not rely on a literal reading of statutory language drafted after CMA's alleged contributions were made. It is well established that the thrust of FECA is to regulate contributions and expenditures made for the relatively narrow purpose of influencing federal elections and that it does not reach activities designed more broadly to promote the discussion of political issues. *See, e. g., Buckley v. Valeo*, 424 U.S. 1, 79–80, 96 S.Ct. 612, 663–64, 46 L.Ed.2d 659 (1976); *United States v. National Committee for Impeachment*, 469 F.2d 1135, 1140 (2d Cir. 1972). Assuming that CMA's donation of goods *and services* to CALPAC were "contributions" only if donated for the purpose of influencing federal elections, the outcome of this case clearly turns on ascertaining the purpose(s) for which the alleged contributions were made.

As noted above, CMA did not specify the use to which CALPAC should put the donated goods and services. CALPAC did not maintain separate accounts to differentiate between funds used for electioneering in general and those used for educational and

lobbying activities. CALPAC has no internal rules or guidelines for the distribution of its funds, and there are no specific items in its budget pertaining to federal as opposed to state electioneering. Stipulation ¶ 9; testimony of Pross, Babb, and Davis. Thus, it has become the Court's task to determine whether CMA's contributions were made for the purpose of influencing federal elections. There appear to be three alternative methods of performing that task. One method, urged by the FEC, is to presume that all contributions to a political action committee are made for the purpose of influencing federal elections. CMA would then bear the burden of rebutting that presumption by establishing that some or all of the contributions were made for other purposes. A second method, urged by CMA and CALPAC, is to require the FEC to prove that each contribution was made for the specific purpose of influencing federal elections. A third method is to allocate the dollar value of CMA's contributions according to the relative proportions of CALPAC's federal and nonfederal activities. For example, if CALPAC gave 75 percent of its candidate contributions to state candidates and 25 percent to federal candidates, then 25 percent of CMA's contributions to CALPAC would be deemed contributions within the meaning of FECA.

The Court is guided in the selection of an appropriate method by the general principles enunciated in other FECA cases, particularly the Ninth Circuit's recent decision regarding the statutory provisions in issue here. The consideration of overriding significance is that although limitations on the amount of contributions to political committees may implicate First Amendment rights, contribution limitations only marginally restrict the exercise of those rights. *Buckley v. Valeo, supra*, 424 U.S. at 20–23, 96 S.Ct. at 635–637.

ployer of the individual rendering such services), but amounts paid or incurred for such legal or accounting services shall be reported in accordance with the requirements of section 434(b) of this title." Former 2 U.S.C. § 431(e)(1)–(4).

Former § 431(e)(1)(A) and (B) were rephrased and carried forward in new § 431(8)(A)(i). Former § 431(e)(4) was rephrased and carried forward as new § 431(8)(A)(ii), with the exception regarding legal and accounting services carried forward as new § 431(8)(B)(ix). Former § 431(e)(2) and (3) were deleted.

"In *Buckley* the Court granted the legislature substantial deference in drawing the Act's contribution limits, without insisting upon the most narrow of categories." *CMA v. FEC, supra*, slip op. at 3381.

By contrast, much less deference is accorded the legislature with respect to the regulation of expenditures by political committees and candidates because those expenditures are directly related to protected political speech. *Buckley v. Valeo, supra*, 424 U.S. at 20–23, 96 S.Ct. at 635–637. Here, the doctors focus on FECA's First Amendment implications in support of their contention that the provisions in question should be narrowly construed and the FEC should be required to prove the specific purpose behind each contribution. However, virtually all of the cases which they cite in this regard involved the regulation of expenditures by, rather than contributions to, political organizations. In each case, the courts narrowly construed the statute to find that advertisements, leaflets, and posters discussing political issues unrelated to any particular election campaign were not "expenditures" subject to regulation or did not render the sponsoring organizations subject to regulation as "political committees" under FECA. *See FEC v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45 (2d Cir. 1980) (re publication of antigovernment spending pamphlet); *United States v. National Committee for Impeachment, supra* (re advertisement calling for the impeachment of President Nixon); *FEC v. American Federation of State, County & Municipal Employees*, 471 F.Supp. 315 (D.D.C.1979) (re poster critical of then–President Ford's pardon of former President Nixon); *American Civil Liberties Union v. Jennings*, 366 F.Supp. 1041 (D.D.C.1973), *vacated as moot sub nom. Staats v. American Civil Liberties Union*, 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975) (re advertisement opposing the Nixon Administration's proposed legislation to limit the busing of school children). In this case, none of CALPAC's expenditures is in issue and there is no doubt but that CALPAC is a political committee subject to regulation under FECA. As the Ninth Circuit stated in rejecting the doctors' First Amendment challenge to the statute:

"[A] political committee is, by design as well as definition, a natural conduit for candidate contributions and * * * the essential purpose of the provision here in question is to limit those contributions, not to limit expenditures for any other type of political advocacy. * * *

* * * * * *

* * * A critical point in this case is that CMA and any other association may spend as much as it chooses to collect for political speech, including advocacy of a particular candidate's election. The limitation here in question applies only to candidate contributions and payments to multicandidate political committees. And the intrusive potential of the limitation is further diminished when it is noted that, as forcefully and often as it chooses, CMA can solicit its members, and anyone else, to give directly to CALPAC." *CMA v. FEC, supra*, slip op. at 3378–3379.

■ Another significant principle articulated by the Ninth Circuit is that the statutory provisions governing contributions to political committees should be construed so as to make meaningful and enforceable the dollar limits on such contributions.

"We have already concluded that there is a legitimate purpose for a limit on an association's contributions to political committees. The administrative assistance provisions are simply a necessary part of this statutory scheme. The Act prevents evasion by including administrative assistance in computation of the dollar limit." *Id.* at 3385.

The above–quoted language compels this Court to reject the doctors' proposed method of computing contributions made for federal electioneering purposes, because to adopt that method would permit and invite CMA, CALPAC, and others similarly situated to evade FECA's contribution limits by using clever accounting practices. Inasmuch as CMA never indicates the purpose

for which it makes its contributions to CALPAC, and CALPAC commingles all of its funds and uses all of its staff to promote various different purposes, it would be well–nigh impossible for the FEC to prove which of CMA's contributions were made for federal electioneering purposes. If the doctors' proposed method were employed, any political committee could flaunt with impunity the statutory contribution limits simply by being imprecise in its solicitations and bookkeeping. The fact that FECA does not govern contributions aimed at influencing state elections would be converted into a means of effectively nullifying the statutory limitations on contributions aimed at influencing federal elections.[7]

■ Once the doctors' proposed method of computing contributions made for federal purposes is rejected, it becomes unnecessary in this case to choose between the two remaining methods. Even under the method more favorable to the defendants, whereby CMA's contributions to CALPAC are allocated according to CALPAC's state and federal contributions, the $5,000 limit was exceeded in each of the years in question. The following table illustrates the application of the allocation method to the facts here:[8]

Table 2

| | 1976 | 1977 | 1978 |
|---|---|---|---|
| 1. CALPAC's contributions to federal candidates | $ 25,950.00 | $ 6,800.00 | $ 21,300.00 |

| | 1976 | 1977 | 1978 |
|---|---|---|---|
| 2. CALPAC's contributions to state candidates | 145,685.07 | 55,583.49 | 329,134.30 |
| 3. % federal | 18.4% | 10.9% | 6.1% |
| 4. CMA's contributions to CALPAC | 79,517.00 | 104,135.00 | 134,981.00 |
| 5. Amount attributable to federal purposes (line 3 x line 4) | 14,631.13 | 11,350.72 | 8,233.84 |

Thus, the Court concludes that CMA violated 2 U.S.C. § 441a(a)(1)(C) during 1976, 1977, and 1978 by making contributions to CALPAC in excess of $5,000 per year.

■ The Court also concludes that CALPAC violated 2 U.S.C. § 441a(f) by knowingly accepting such excessive contributions from CMA during each of the years in question. The record clearly establishes that CALPAC knew that CMA was paying for its operating and administrative expenses and that CALPAC voluntarily and intentionally accepted CMA's in–kind payments. That CALPAC did not know whether in–kind contributions by unincorporated associations were subject to the $5,000 limit, a fact which no one "knew" until the Ninth Circuit's decision was handed down on May 23, 1980, does not save it from liability. CALPAC knew the facts (accepting in–kind contributions exceeding $5,000 from CMA) which rendered its conduct unlawful. Such knowledge is sufficient to create civil liability under 2 U.S.C. § 441a(f). *Cf. In re Federal Election Campaign Act Litigation,* 474 F.Supp. 1044, 1047 (D.D.C.1979). CALPAC has *not* been

7. This is not to suggest that CMA and CALPAC would be penalized for not employing the accounting procedures outlined in the FEC's regulations. As of April 13, 1977, the FEC requires political committees involved in both state and federal election campaigns either to maintain a separate account solely for contributions and expenditures related to federal elections, or to establish a separate political committee "which shall receive only contributions subject to the prohibitions and limitations of the Act, regardless of whether such contributions are for use in connection with federal or non–federal elections." 11 C.F.R. § 102.5 (1980) (formerly 11 C.F.R. § 102.6). Where a solely–federal campaign committee is established, it is to "allocate administrative expenses on a reasonable basis between their Federal and non–Federal accounts in proportion to the amount of funds expended on Federal and non–Federal elections, or on another reasonable basis." 11 C.F.R. § 106.1(e). Neither regulation addresses precisely the situation involved here. Section 102.5 applies to financial contributions capable of being placed in a bank account, rather than to in–kind contributions. Section 160.1(e) pertains to expenditures by, rather than contributions to, political committees. However, the regulations are instructive insofar as they suggest feasible means by which CMA and CALPAC could comply with, and the FEC could enforce, the contribution limits where in–kind contributions are made to a multi–purpose political committee.

8. Data in lines 1, 2, and 4 taken from Stipulation ¶¶ 6–8, 10–12.

charged with a "knowing and willful violation" which must be shown in order to impose FECA's double–penalty provision. 2 U.S.C. § 437g(a)(6)(C).

### III

 In addition to a declaration of the defendants' liability, the FEC seeks the imposition of civil penalties and the issuance of a permanent injunction. FECA authorizes the Court to impose a civil penalty "which does not exceed the greater of $5,000 or an amount equal to the amount of any contribution or expenditure involved in [the] violation." 2 U.S.C. § 437g(a)(6)(B), formerly 2 U.S.C. § 437g(a)(5)(C) (1976). In this case, the civil penalty may not exceed $9,631.13 for the 1976 violation, $6,350.72 for the 1977 violation, and $5,000 for the 1978 violation.[9] Thus, the maximum penalty would be a total of $19,235.69. The FEC limited its request to a $5,000 penalty for each defendant because of the complex constitutional and statutory questions surrounding this litigation. In light of that factor, the Court finds that a $5,000 penalty upon each defendant is reasonable and appropriate.

The propriety of injunctive relief, which is authorized by the same statutory provision cited above, is governed by a three–part test. The Court is to consider whether (1) the defendants acted in good faith and with diligence to cure the violation, (2) the task faced by the defendants in complying with the statute was complex and whether the statute was difficult to interpret, and (3) an order would have any effect in ensuring better compliance in the future. *FEC v. Committee for a Constitutional Presidency–McCarthy '76*, Fed. Elec. Campaign Financing Guide (CCH) ¶ 9074 at 50,632 (D.D.C.1979). In this case, the FEC has not shown that the defendants did not act in good faith to attempt to cure the violation. Both parties acknowledge the complexity of the issues and the facial ambiguity of at least some of the statutory provisions in question. Finally, there is no indication that an injunction would be necessary in order to ensure future compliance with FECA's contribution limits. Thus, the Court concludes that injunctive relief is not warranted at this time.

This Opinion constitutes findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Accordingly, IT IS HEREBY ORDERED that:

1. Judgment shall be entered in favor of the Federal Election Commission and against the California Medical Association and the California Medical Political Action Committee on the Federal Election Commission's first claim for relief.

2. Each defendant shall pay a civil penalty of five thousand dollars ($5,000) to the Federal Election Commission.

The parties shall lodge a stipulated form of judgment by October 31, 1980.

---

**9.** These figures were computed by subtracting $5,000 from the figures listed on line 5 of table 2. The 1978 figure is set at $5,000 in the text because the excessive portion of the contribution was $3,233.84, which is less than $5,000.