**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**FRIENDS OF JANE HARMAN, et al., Defendants.**

No. CV 98–7691 CAS (JGX).

United States District Court, C.D. California, Western Division.

Aug. 18, 1999.

**1048**

Lawrence M. Noble, Stephen E. Hershkowitz, Richard B. Bader, Erin K. Monaghan, Laura M. Friedman, Federal Election Com'n, Washington, DC, for plaintiff.

Charles F. Palmer, Perkins Coie, Los Angeles, CA, Marc E. Elias, Brian G. Svoboda, Robert F. Bauer, Perkins Coie, Washington, DC, for defendants

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SNYDER, District Judge.

### I. INTRODUCTION

This case is an enforcement action brought by the Federal Election Commission ("FEC") against defendants Friends of Jane Harman ("Harman Campaign") and Jacki Bacharach ("Bacharach"). The allegations in this lawsuit arise out of a fundraising event held for former United States Representative Jane Harman ("Harman") at the headquarters of Hughes Aircraft Company ("Hughes") on October 29, 1993 ("the October 1993 fundraiser").

The FEC filed the complaint in the present action in this Court on September 22, 1998. In its complaint, the FEC alleged that defendants violated 2 U.S.C. § 441b(a) by accepting corporate contributions, and sought an order requiring defendants to disgorge the allegedly prohibited contributions, as well as civil penalties pursuant to 2 U.S.C. § 437g(a)(6)(B). On March 29, 1999, this Court denied defendants' motion to dismiss the complaint.

The parties' cross-motions for summary judgment are presently before the Court.

### II. FACTUAL BACKGROUND

The FEC is a federal agency with jurisdiction over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act of 1971 ("FECA" or "the Act"), 2 U.S.C. §§ 431 *et seq.* The Harman Campaign served as an authorized political committee, as defined in 2 U.S.C. § 431(4), for Representative Harman from 1992 to 1994. Bacharach served as treasurer for the Harman Campaign during this time period. *See* 2 U.S.C. § 432(a).

The principal facts in this litigation are not in dispute. In Spring 1993, Representative Harman met with C. Michael Armstrong ("Armstrong"), then the Chief Executive Officer and Chairman of Hughes. Complaint, ¶ 21; Answer, ¶ 21; Deposition of Jane Harman ("Harman Depo.") at 26:14–27:9, Exhibit 5 to Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law ("Plaintiff's Statement"). Harman asked Armstrong to host a fundraiser for her campaign, and also asked him to support her request for contributions from the Hughes Active Citizenship Committee ("Hughes PAC"). *Id.* Armstrong agreed to her requests, and told William Merritt ("Merritt"), Vice President of Hughes' Washington D.C. office and the administrator of the Hughes PAC, about the proposed fundraiser. Complaint, ¶ 21; Answer, ¶ 21. On April 22, 1993, Merritt called Jo–Ann Costa ("Costa"), Hughes Director of Public Affairs, and asked her to make arrangements for the fundraiser. Deposition of Jo–Ann Costa ("Costa Depo.") at 38:12–40:17, Exhibit 1 to Plaintiff's Statement. Merritt told Costa she should contact Judy Sitzer ("Sitzer"), a member of Harman's campaign staff, to coordinate the arrangements for the event. *Id.* at 38:12–39:21.

After receiving Merritt's instructions about the proposed fundraiser, Costa telephoned Hughes' District of Columbia office

for further information regarding campaign contribution limits. *Id.* at 46:14–47:2. She also telephoned Hughes' outside legal counsel at the law firm of Nielsen, Merksamer, Parrinello, Mueller & Naylor (hereafter, "the Nielsen firm") to find out the legal requirements for holding the fundraiser. *Id.* at 47:3–6. She asked counsel what the best method for holding the fundraiser would be. *Id.* at 47:3–18. Counsel suggested that the fundraiser be held in the home of a Hughes executive. *Id.* at 47:14–18. Costa informed Merritt about the legal advice she had received, and Merritt told her that the fundraiser should nonetheless be held at Hughes' corporate offices. *Id.* at 48:4–9. Costa then spoke to the Nielsen firm again, and sought advice regarding the legal requirements for holding the fundraiser at Hughes. *Id.* at 48:10–15.

In May 1993, Costa and Sitzer met at Hughes' offices to coordinate arrangements for the fundraiser, and discussed tentative dates in June and July 1993. *Id.* at 54:3–8. At that time, Costa explained to Sitzer that according to Hughes' legal counsel, the Harman Campaign would have to reimburse Hughes for the cost of the room, the cost of the food, Costa's time, and any materials used. Deposition of Judy Sitzer ("Sitzer Depo.") at 54:5–55:10, 58:9–59–8, Exhibit 3 to Plaintiff's Statement. Sitzer understood that Costa would take care of all arrangements for the fundraiser, including the room and catering. Complaint, ¶ 23; Answer, ¶ 23. Sitzer told Representative Harman about her meeting with Costa, and explained the arrangements made by Costa. Sitzer Depo. at 62:11–22. Sitzer did not discuss the legal implications of the fundraiser with Costa or anyone else at Hughes after the initial lunch meeting. *Id.* at 76:20–77:7.

Costa wrote a letter to Sitzer dated May 18, 1993, thanking her for her help. The letter stated: "I appreciate your interest in Hughes' invitation to Ms. Harman to join us in a reception in her honor." Exhibit 2 to Costa Depo. During the next few months, the date of the fundraiser was changed several times based on scheduling problems. In early October 1993, Merritt spoke with the Chief of Staff of Harman's congressional office to schedule a date for the Hughes event. The fundraiser was set for October 29, 1993. Costa Depo. at 92:18–93–13. Costa contacted Sitzer to ensure that Sitzer knew the October 29th date had been agreed upon. Complaint, ¶ 24; Answer, ¶ 24. Sitzer suggested to Costa that the contributions be sent to the Harman Campaign's post office box, which was the normal practice for receiving contributions to the Campaign. Sitzer Depo. at 102:10–103–4. Sitzer testified that with respect to this fundraiser, the contributions were instead collected by Costa because "[t]hat is the way Hughes wanted it to be done." *Id.* at 102:10–13.

In early October 1993, Hughes distributed two invitations to the fundraiser. The first invitation was on Hughes corporate stationery and dated October 12, 1993 ("the October 12 letter"). This letter was drafted by Costa and signed by Armstrong. Costa Depo. at 105:3–10, 109–16–110:3. The letter states "I would personally like to invite you to a reception for U.S. Congresswoman Jane Harman·on October 29, 1993." Exhibit 7 to Costa Depo. The letter requested that the addressee respond to Costa. *Id.* Costa distributed a draft of the October 12 letter to T.G. Westerman ("Westerman"), Senior Vice President for Human Resources and Administration and Chief Administrative Officer for Hughes, Larry Wheeler, Hughes' Director of Congressional Affairs, Merritt, and possibly Sitzer for review.[1] Costa Depo. at 111:3–13. Westerman, who was Costa's supervisor, made a few minor word

---

**1.** It is not clear from the record whether Sitzer actually received a copy of this letter. Costa stated in her deposition: "I believe I faxed a copy [of the October 12 letter] to Judy Sitzer because she had asked me earlier to send her a copy of the invitation." Costa Depo. at 111:9–11. For her part, Sitzer does not remember receiving a copy of this letter. Sitzer Depo. at 72:5–73–8.

changes to the draft. *Id.* at 111:8–15. Armstrong also saw a draft of the letter. Deposition of C. Michael Armstrong ("Armstrong Depo.") at 26:15–18, Exhibit 2 to Plaintiff's Statement. Costa also read the letter to Hughes' outside counsel over the phone. Costa Depo. at 114:7–12. This letter was sent to approximately 233 Hughes executives.

Costa also drafted a second invitation letter for the fundraiser dated October 13, 1993 ("the October 13 letter"). This letter states in part:

> You've probably received Mike's invitation to the reception for U.S. Congresswoman Jane Harman on October 29th by now. This letter is to ask you and your senior people to participate in the fundraising portion of the event as Ms. Harman is certain to face well-financed opposition in the next election.

Exhibit 8 to Costa Depo. The letter then specifies contribution amounts according to corporate position, and continues as follows:

> Please extend the invitation to contribute to the senior people (Staff Vice Presidents and E9's) reporting to you. Contributions are voluntary.
>
> Personal checks should be made payable to "Friends of Jane Harman" .... Corporate funds cannot be accepted pursuant to Federal Election Commission law. Please forward checks, along with your RSVP, to Jo–Ann Costa, CO/C01/C129, in advance of the event.
>
> Thank you. Your contribution and attendance is appreciated.

*Id.* The letter was drafted for signature by Westerman and Merritt under the name of the Hughes PAC. Costa drafted the letter with input from Merritt and Westerman. Costa Depo. at 119:1–3. She read a draft of the letter to legal counsel at the Nielsen firm. *Id.* at 120:2–4. After she drafted the letter, some changes were made to the letter, including the addition of the phrase "please forward checks, along with your RSVP, to Jo–Ann Costa, at the address, in advance of the event." *Id.* at 121:7–15. The name of the Hughes PAC was also added to the draft letter above the signatures of Merritt and Westerman. *Id.* at 121:16–17. These changes were in Westerman's handwriting. *Id.* at 121:7–20.

Costa called the Nielsen firm with questions about the changes "because this draft was significantly different from the information that I had been given in April and the Hughes Active Citizenship Committee was something brand new." *Id.* at 122:5–18. Costa stated "I read this letter to [legal counsel]. I told them about the letter foot, who signed it, the forwarding of checks, everything, the suggested contributions, the whole bit, and cleared it with outside legal counsel on the phone." *Id.* at 123:12–17. This letter was distributed to approximately thirty-eight of the most senior executives of Hughes. *Id.* at 120:12–121:6. It is not clear from the record whether Costa provided a copy of this letter to Sitzer.[2]

On October 25, 1993, Costa received a memorandum from Jim Sutton of the Nielsen firm ("the October 20 memo"). The memorandum is dated October 20, 1993, but was not read by Costa until October 27, 1993. *Id.* at 141:1–3. The memorandum sets forth the following issue as being the basic question:

> Jo–Ann Costa asked whether Hughes could host an event for Congresswoman Jane Harman. The basic question is whether Hughes may pay for the cost of this event out of corporate funds, or whether Hughes PAC or Congressman [sic] Harman's campaign committee must reimburse the corporation for the costs of the event.

Exhibit 9 to Costa Depo. The memorandum is divided into two subheadings labeled "A. Events financed by Hughes" and

---

**2.** Costa testified that: "This [October 13] letter was written after the first letter that I faxed to her. So, I don't have specific recollection of this letter being faxed to her, although I suspect I did fax it to her. I just don't know." *Costa Depo.* at 119:10–17. Sitzer does not remember receiving a copy of the October 13 letter. *Sitzer Depo.* at 73:4–8.

"B. Events financed by PAC or candidate." The advice contained under subheading "B" reads in relevant part:

> If the PAC or the candidate's committee reimburses the corporation for the costs of the event, then the corporation may invite employees or others outside of its restricted class. A return envelope may also be included in invitations to a PAC or candidate-financed fundraiser, though the corporation may not allow checks to be sent through interoffice mail or use corporate letterhead. In addition, attendees may be charged a fee (in other words, a campaign contribution) for attending the fundraising event, though they may not be charged a fee for attending a partisan communication candidate appearance.

*Id.* Costa stated that the advice was "significantly different than the advice that I was given verbally on the phone [when discussing the letters]." Costa Depo. at 143:10–16. Specifically, Costa contends that some of the advice in the October 20 memo—particularly as to the propriety of her use of corporate letterhead and collection of employee contributions through interoffice mail—was contrary to advice she had previously been given.[3]

On approximately October 27, 1993, Costa sent a copy of the October 20 memo to Joe Dooley ("Dooley"), Hughes Manager of State Government Relations, along with a note reading:

> Let's discuss the Harman fundraiser. We are okay, but Sutton's letter is dated 10/20—long after Chip Nielsen's initial telephone advice the first of October. Letters went out on the 13th. I believe he did not have his facts real straight.

*Id.* at 145:17–21; Exhibit 12 to Costa Depo. Dooley and Costa discussed the contents of the October 20 memo. They con-cluded that any differences between the October 20 memo and the earlier advice were "technical," and that it was too late to stop the fundraiser only two days before the event. Costa Depo. at 145:22–146:6. Costa and Dooley did not tell anyone else about the October 20 memo at that time. *Id.* at 148:21–150:21. There is no dispute that no representative of the Harman Campaign was ever advised prior to the filing of the complaint in the FEC administrative action of the October 20 memo or the ensuing discussion between Dooley and Costa.

On October 29, 1993, Representative Harman appeared at the fundraiser held at in the executive dining room of Hughes' corporate headquarters. Approximately 100 people attended. Complaint, ¶ 32; Answer, ¶ 32. Costa collected some contributions for the fundraiser via interoffice mail prior to the event, and collected others from executives at the door. Costa Depo. at 152:3–7. A few days after the event Sitzer picked up the checks from Costa, which totaled $20,600 in individual contributions from over 100 contributors. *Id.* at 163:5–17.

On November 9, 1993, Costa sent an invoice to Sitzer, asking her to make two separate payments for the event, one to Hughes for "out-of-pocket" expenses, and the other to Canteen Corporation for catering expenses. *Id.* at 165:1–7. The expenses billed to the Harman Campaign from Hughes for the fundraiser included 400 letters at 4 cents each ($16.00), staff labor for Jo-Ann Costa, Maria Rodrigues, Joe Dooling, Erna Janus ($731.46), a facilities cost ($50.00), 100 badges ($10.00), and "other administrative" costs ($50.00). Exhibit 13 to Costa Depo. The Harman Campaign paid Hughes $857.46 on February 9,

---

3. In her deposition, Costa testified: "There is a lot that is different, but specifically what I zeroed in on was on page 2: 'A return envelope may also be included in invitations to a PAC or candidate-financed fundraiser, though the corporation may not allow checks to be sent through interoffice mail or use corporation letterhead.' That stood out like a sore thumb to me because we discussed that in our previous conversation and this was not at issue at the time. In reading this against the advice that I had been previously given, it was very confusing in that it appeared that I had done parts of A and parts of B, but I hadn't been consistent with either A or B in its entirety." Costa Depo. at 144:1–20.

1994. Costa Depo. at 166:4–7. The Harman Campaign also paid the Canteen Corporation directly for the food catered at the fundraiser, in the amount of $950.00. *Id.* at 164:17–165:7.

## III. PROCEDURAL BACKGROUND

On June 6, 1994, the FEC received a complaint from Harman's opponent in the general election alleging that defendants had violated the FECA by accepting contributions at a fundraising event sponsored by a corporation. The complaint was designated by the FEC as a Matter Under Review for administrative purposes. The FEC notified defendants that the complaint had been filed, and on July 28, 1994, received a response from defendants pursuant to 2 U.S.C. § 437g(a)(1). On April 23, 1996, the FEC, by an affirmative vote of the requisite four members, found reason to believe that defendants violated 2 U.S.C. § 441b(a) by knowingly accepting corporate campaign contributions. The General Counsel of the FEC notified defendants on October 7, 1997, that the General Counsel was prepared to recommend that the FEC find probable cause to believe that defendants violated section 441b(a) by knowingly accepting corporate campaign contributions. Defendants filed a response with the FEC. On March 3, 1998, the FEC, by affirmative votes of four members, found probable cause to believe that defendants had violated provisions of the Act. Defendants were notified of this decision by letter, along with a proposed conciliation agreement. Pursuant to 2 U.S.C. § 437g(a)(4)(A)(i), the parties attempted for at least thirty days to use informal methods to resolve the issue. The parties were unable to reach a resolution through informal methods, and the FEC subsequently authorized the commencement of the instant action against defendants.[4]

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party bears the burden of proof at trial, "the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Gipson v. Kajima Eng'g & Constr., Inc.,* 972 F.Supp. 537 (C.D.Cal.1997).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. *See* Fed.R.Civ.P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). *See also Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322,

---

4. In September 1996, Hughes entered into a conciliation agreement with the FEC. The agreement provides that, "[n]otwithstanding the belief of [Hughes] that the event was conducted in compliance with the Act," Hughes violated 2 U.S.C. § 441b(a) "by providing the use of corporate facilities and personnel for fundraising activities and by facilitating the making of $21,000 in contributions" to the Harman Campaign. Exhibit 16 to Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment. Hughes paid a civil penalty in connection with this agreement.

106 S.Ct. 2548. *See also Abromson v. American Pac. Corp.*, 114 F.3d 898, 902 (9th Cir.1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 & n. 3 (9th Cir.1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec, Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.,* 121 F.3d 1332, 1335 (9th Cir.1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

In this case, the parties have stipulated as to the material facts, and agree that these cross motions present issues to be decided as a matter of law.

## V. DISCUSSION

### A. *Background*

The complaint in this action alleges that defendants committed two violations of section 441b(a) of the Federal Election Campaign Act in connection with the October 1993 fundraiser. Section 441b(a) prohibits corporations from using general treasury funds "to make a contribution or expenditure in connection with any election" in connection with federal elections. 2 U.S.C. § 441b(a).[5] A "contribution" or "expenditure" includes "any direct or indi-

rect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value" to any candidate for federal office. 2 U.S.C. § 441b(b)(2). In turn, it is unlawful for political committees or candidates knowingly to receive prohibited contributions or expenditures. 2 U.S.C. § 441b(a).

The FEC first alleges that defendants violated section 441b(a) "by knowingly accepting $20,600 in corporate contributions." Complaint, ¶ 35. Second, the FEC contends that defendants violated section 441b(a) "by knowingly accepting an advance of $857.46 in corporate funds." *Id.,* ¶ 38. The FEC argues that because the undisputed facts in this litigation demonstrate that defendants violated the Act, summary judgment in its favor is appropriate.

Defendants make several arguments in opposition to the FEC's motion and in support of their motion for summary judgment. First, defendants argue that their conduct did not violate section 441b(a), and conformed with the regulations that were in effect in 1993. Second, defendants claim that they reasonably relied in good faith on the advice of counsel that the fundraiser was conducted in a lawful manner. Third, defendants contend that the FEC has pursued inconsistent theories of liability in these proceedings, to the prejudice of defendants. Fourth, defendants argue that the FEC is attempting retroactively to enforce rules not in existence at the time of the October 1993 fundraiser, and consequently, by this proceeding, the FEC seeks relief that is violative of defendants' due process rights. Finally, defendants contend that the FEC has acted arbitrarily and capriciously in filing this action in violation of the Administrative Procedure Act.[6]

---

**5.** Section 441b(a) provides in relevant part:
It is unlawful for ... any corporation whatever ... to make a contribution or expenditure in connection with any election ... or in connection with any primary election ... or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section ....

**6.** Defendants' first and fourth arguments are addressed below in assessing the merits of the FEC's claims against defendants. The Court finds that defendants' contention regarding their reliance on the advice of counsel is more appropriately addressed in evaluating whether penalties should be assessed in this action. Defendants' third and fifth arguments do not

### B. *"Earmarked Contributions"*

■ The FEC first contends that defendants violated the broad language of section 441b(a) by knowingly accepting $20,600 in corporate contributions. There is no dispute that the contributions to the Harman Campaign came from individual Hughes employees, and not from Hughes' corporate treasury. Accordingly, it cannot be said that the violation was the acceptance of corporate contributions. Rather, this case concerns the role of Costa, a Hughes employee, in collecting and forwarding individual contributions made by Hughes executives to the Harman Campaign. The FEC contends that because Costa's conduct violated the Act's prohibition on corporations acting as conduits or intermediaries, the Harman Campaign received an impermissible corporate benefit by accepting the contributions collected by Costa.[7]

In support of its argument that Costa's actions violated the FECA, the FEC relies on regulations concerning "earmarked contributions."[8] Section 110.6(a) of the Code of Federal Regulations provides:

> All contributions by a person made on behalf of or to a candidate, including contributions which are in any way earmarked or otherwise directed to the candidate through an intermediary or through an intermediary or conduit, are contributions from the person to the candidate.

11 C.F.R. § 110.6(a). The regulation states that "conduit or intermediary means any person who receives and forwards an earmarked contribution to a candidate or a candidate's authorized committee." 11 C.F.R. § 110.6(b)(2). The regulation then lists a number of persons who are not

considered conduits or intermediaries, including campaign committee volunteers, fundraising representatives, and commercial fundraising firms. 11 C.F.R. § 110.6(b)(2)(i). Section 110.6(b)(2)(ii) provides in relevant part:

> Any person who is prohibited from making contributions or expenditures in connection with an election for Federal office shall be prohibited from acting as a conduit for contributions earmarked to candidates or their authorized committees.

11 C.F.R. § 110.6(b)(2)(ii). The remainder of the regulation addresses reporting requirements for these so-called "earmarked contributions."

The FEC contends that by reading section 110.6(b)(2)(ii) in conjunction with section 441b(a), the language "any person who is prohibited from making contributions or expenditures in connection with an election for Federal office" includes corporations.[9] Consequently, the FEC argues, Hughes was prohibited from acting as a "conduit" or "intermediary" for contributions directed to the Harman Campaign. The FEC contends that Costa's actions, as a Hughes employee, in collecting, holding, and forwarding the individual checks, violated the conduit rules in section 110.6(b)(2)(ii).

As noted above, section 441b(a) prohibits candidates or their committees from accepting "anything of value" from a corporation. *See* 2 U.S.C. § 441b(b)(2). Therefore, the FEC argues that in this case defendants received an impermissible corporate benefit in accepting the "bundle" of contributions collected by Costa. The FEC contends that defendants' knowing acceptance of these contributions violated section 441b(a).

---

bear on whether a violation of the FECA occurred.

**7.** At a telephonic hearing on these motions, the FEC conceded that had Costa requested that Hughes employees mail their contributions to the Harman Campaign directly, there would have been no violation of the conduit provisions of the FECA. *See* Reporter's Transcript of Telephonic Conference ("Rep.'s Tr."), July 21, 1999, at 4:21–5:17.

**8.** These regulations were promulgated under 2 U.S.C. § 441a(a)(8), a section of the Act dealing with contribution limits.

**9.** Section 431(11) of the FECA provides that for purposes of the Act "the term 'person' includes an individual, partnership, committee, association, corporation, labor organization, or any other organization ...." 2 U.S.C. § 431(11).

■ The Ninth Circuit's opinion in *Federal Election Comm'n v. Ted Haley Cong. Comm.*, 852 F.2d 1111 (9th Cir.1988), provides guidance in evaluating whether the FEC has correctly determined that defendants' actions violated section 441b(a). As a preliminary matter, the Court must look to the standard enunciated in *Chevron, USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Ted Haley*, 852 F.2d at 1113 (quoting *Chevron*). Agency interpretation of a statute will generally be entitled to deference. *See id.* at 1114 (noting that "the interpretation of statutes and regulations by an agency charged with their administration is entitled to due deference and should be accepted unless demonstrably irrational or clearly contrary to the plain meaning").

The Supreme Court has held that the FEC is vested by Congress with primary and substantial responsibility for administering and enforcing FECA and that the Commission is provided with extensive rule making and adjudicative powers. The Supreme Court also held ... that the FEC 'is precisely the type of agency to which deference should presumptively be afforded.'

*Id.* (citations omitted).

The facts surrounding the collection of the contributions in this case are undisputed. The October 13 letter requested Hughes employees to forward contributions for the Harman Campaign to Costa in advance of the fundraiser via interoffice mail. Costa testified that she received some contributions prior to the event, and collected others at the event. There is also no dispute that Sitzer picked up the $20,600 in individual contributions from Costa a few days after the event.

Section 441b does not expressly state whether the acceptance of a bundle of contributions from a corporate employee constitutes an impermissible corporate contribution. Therefore, this Court must determine whether the interpretation of section 441b by the FEC is "based upon a permissible interpretation of the statute." *Ted Haley*, 852 F.2d at 1113.

■ The interpretation of the FECA by the FEC through regulations "is entitled to due deference and is to be accepted by the court unless demonstrably irrational or clearly contrary to the plain meaning of the statute." *Id.* at 1115. Defendants argue that the FEC's interpretation is incorrect, and that under the regulations in existence at the time, it was unclear that the corporate facilitation of contributions constituted an impermissible benefit.[10]

---

**10.** Defendants place great reliance on 11 C.F.R. § 114.9(d), promulgated under the statute prohibiting corporate contributions, 2 U.S.C. § 441b. Section 114.9(d) provides as follows:

> Persons, [who are not acting in an individual volunteer capacity], who make any use of corporate or labor organization facilities, such as by using telephones or typewriters

or borrowing office furniture, for activity in connection with a Federal election are required to reimburse the corporation or labor organization within a commercially reasonable time in the amount of the normal and usual rental charge.

Defendants argue that this language permitted Costa, who was not acting as a volunteer, to engage in the activities set forth therein.

■ If Costa, in her capacity as a Hughes employee, was acting as a conduit or intermediary, then her conduct violated the prohibition against a corporation acting as a conduit or intermediary. The Court finds that Costa's actions in collecting checks conferred a benefit on the Harman Campaign. Consequently, when Sitzer received the checks collected by Costa, there was an apparent violation of section 441b's prohibition against accepting "anything of value" from a corporation.[11]

Therefore, the Court concludes that despite the arguably unclear nature of the statutory and regulatory prohibitions at the time of the events in question, the FEC's interpretation of the FECA is entitled to deference, and is reasonable, and the Harman Campaign violated 2 U.S.C. § 441b(a) by accepting individual contributions collected by a corporate intermediary.[12]

### C. *Reimbursement*

■ The FEC also contends that defendants violated section 441b(a) by accepting an advance of $857.46 in corporate funds. The principal facts surrounding this issue are also not in dispute. Hughes incurred costs in connection with the October 1993 fundraiser, and billed the Harman Campaign for these costs following the event. The invoice submitted to the Harman Campaign consisted of $731.46 in staff labor and $126.00 in miscellaneous facilities and administrative costs. The Harman Campaign reimbursed Hughes in the amount of $857.46 on February 9, 1994.

Defendants argue that the reimbursement of costs for the use of corporate facilities was expressly permitted under regulations existing in 1993. Defendants point to section 114.9 of the Code of Federal Regulations, which sets forth the rules concerning the use of corporate or labor organization facilities by candidates. Defendants contend that 11 C.F.R. § 114.9(d) expressly allowed the conduct in the present case. Section 114.9(d) provides in part:

> [P]ersons ... who make any use of corporate or labor organization facilities, such as by using telephones or typewriters or borrowing office furniture, for activity in connection with a Federal election are required to reimburse the corporation or labor organization within a commercially reasonable time in the amount of the normal and usual rental charge ....

11 C.F.R. § 114.9(d). Defendants claim that by reimbursing Hughes for the use of its facilities within a commercially reasonable time after the event, they complied with existing law.

The FEC argues that under the circumstances of this case reimbursement under section 114.9(d) was not permissible. The FEC contends that while section 114.9(d) allows for reimbursement for the use of facilities, it does not allow for the reimbursement of labor costs. Therefore, the FEC claims that the use of corporate employee services by the Harman Campaign

---

However, section 110.6(b)(2)(ii), also in effect at that time, clearly prohibited Costa (as a corporate employee) from acting as a conduit for contributions to the campaign. Nonetheless, the fact that section 110.6 was not promulgated under section 441b (the statute at issue in this litigation) lends some weight to defendants' due process argument.

11. The statute prohibits a campaign committee from "knowingly" accepting or receiving a prohibited contribution. The statute does not require knowledge of the illegality of the conduct at issue. A " 'knowing' standard, as opposed to a 'knowing and willful' one, does not require knowledge that one is violating a

law, but merely requires an intent to act." *Federal Election Comm'n v. Dramesi for Congress Committee*, 640 F.Supp. 985, 987 (D.N.J. 1986); *see also Federal Election Comm'n v. California Med. Ass'n*, 502 F.Supp. 196, 203–204 (N.D.Cal.1980) (finding that party's knowledge of the facts making his conduct unlawful constitutes a "knowing acceptance" under the Act).

12. To the extent the FEC asserts claims against Bacharach in her capacity as treasurer for the Harman Campaign, the Court reaches the same conclusions as it does with respect to the Harman Campaign.

constituted an advance of corporate funds in violation of the Act.

The broad language of section 441a(b)(2) provides that "contribution" or "expenditure" includes an "advance" or "any services." The language of section 114.9(d) appears to allow for reimbursement for the use of corporate facilities, and does not specify whether labor costs could be reimbursed. Pursuant to the standard set forth above, it appears that the Court must defer to the construction of the statute advanced by the FEC. Because the Harman Campaign did not pay for the use of employee services until after the event occurred, it appears that $731.46 constituted an "advance" of corporate funds, and was therefore an impermissible contribution.[13]

## VI. PENALTIES

### A. *Background*

On the basis of the undisputed evidence before the Court, the Court concludes that defendants violated section 441b(a) of the FECA by accepting corporate contributions. However, a close examination of the facts surrounding defendants' conduct indicates that these were not deliberate violations of the federal election laws. There is no evidence that defendants believed at the time that the fundraiser was not being conducted in accordance with existing law. In addition, the Court notes that the violations themselves are not substantial nor obvious. The FEC concedes that with only modest modifications, the events surrounding the 1993 fundraiser would have been perfectly legal. For example, if the

contributions by Hughes executives had gone to a post office box, and a Harman Campaign employee had collected individual checks at the fundraiser, the "conduit" issue would not have arisen. *See* Rep.'s Tr. at 4:21–5:17. If the Harman Campaign had paid Hughes in advance for employee time, defendants' reimbursement for their services would also not be at issue. Furthermore, as defendants point out, the FEC issued clarifying regulations with respect to "corporate facilitation" of contributions subsequent to the events at issue in this litigation. *See id.* at 8:16–9:6. The regulations currently in effect clarify the scope of permissible corporate activity.[14] The case before the Court involves a detailed analysis of complex statutes and regulations, with fine lines separating permissible and impermissible activity. Consequently, although the Court finds that violations occurred, it is with the above considerations in mind that the Court addresses the FEC's request for penalties and injunctive relief in this action.[15]

### B. *Applicable Law*

Section 437g(a)(6)(B) of the FECA provides that upon a finding that the Act has been violated:

[T]he court may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed, or is about to commit (if the relief sought is a

---

**13.** The Court finds that plaintiff's motion for additional discovery pursuant to Rule 56(f) concerning the reasonableness of the Hughes invoice and rental rates for the use facility is rendered moot by virtue of the Court's findings and conclusions herein.

**14.** For example, 11 C.F.R. § 114.2, which deals with corporate "facilitation" of contributions, explicitly provides that corporate employees may "plan, organize or carry out" a fundraising project so long as the corporation "receives advance payment for the fair market value of such services." 11 C.F.R.

§ 114.2(f)(2)(i)(A). No such regulation existed at the time of the activities at issue in the present case.

**15.** The FEC seeks the following relief: (1) a declaration that defendants violated section 441b(a) by knowingly accepting corporate contributions; (2) a permanent injunction preventing defendants from future violations of the Act; (3) disgorgement in an amount equal to the amount of contributions received; and (4) an "appropriate civil penalty" pursuant to 2 U.S.C. § 437g(a)(6)(B).

permanent or temporary injunction or a restraining order), a violation of this Act

. . . .

2 U.S.C. § 437g(a)(6)(B).

### C. *Penalties and Disgorgement*

■ As the statutory language makes clear, "[t]he assessment of civil penalties is discretionary." *Ted Haley*, 852 F.2d at 1116. "[I]n determining the amount of a penalty, a district court should consider (1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the responsible federal agency." *Federal Election Comm'n v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir.1989).

■ The FEC contends that defendants should be required to disgorge the amount of the unlawful contributions along with an additional civil penalty. The FEC contends that disgorgement is appropriate to eliminate the benefit accrued to defendants from the unlawful contributions. The FEC argues that a penalty should also be imposed as a deterrent to future violations.

Defendants' state of mind is clearly relevant in assessing the amount of a penalty. *See id.* at 1259 n. 2; *Ted Haley*, 852 F.2d at 1116. In *Ted Haley*, the Ninth Circuit upheld the district court's decision not to impose any civil penalties where the good faith of the defendants was apparent. "The circumstances of [appellees'] candid reporting of the loan guarantees, the rapid repayment of the loan by the former candidate from personal funds and the clear innocence of [appellees'] motives leaves no justifiable grounds for assessment of pen-

alties." *Ted Haley*, 852 F.2d at 1116 (quoting district court decision).

■ The Court finds that the absence of evidence that defendants intended to accept improper contributions is a significant factor in determining whether disgorgement or a penalty is appropriate. In defending this litigation, defendants argue that they relied on the advice of Hughes' counsel. The Court concludes that this fact is relevant to evaluating defendants' belief that their conduct was lawful.

The FEC argues that defendants cannot rely on an "advice of counsel" defense in this action because defendants actually relied on a Hughes employee, and not directly on their own attorneys. It appears that indirect reliance on the advice of counsel to a third party is appropriate where "the interests of the defendant and the person on whose counsel he is relying are substantially the same." Douglas Hawes and Thomas Sherrard, "Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases," 62 *Va. L.Rev.* 1, 28 (1976); *see also United States v. Crosby*, 294 F.2d 928, 942 (2d Cir.1961) (in criminal proceeding involving sales of unregistered securities, brokers' good faith reliance on advice of the issuer's counsel to the effect that registration was not required was a valid defense to criminal liability). Costa told the Nielsen firm about the fundraiser, and asked for advice concerning the legal requirements for holding the event. The evidence demonstrates that Costa told Sitzer that she had consulted with legal counsel, and that Sitzer relied in good faith on Costa's representations that the fundraiser was conducted in accordance with legal requirements.[16] Under these circum-

---

16. In a declaration dated July 24, 1996, Sitzer stated:

    2. In the fall of 1993, I met with Jo Ann Costa to discuss the details of the potential fund-raiser for Congresswoman Harman.

    3. At that meeting Jo Ann told me that she had been instructed by the Hughes legal counsel about what the parameters would be for their involvement.... Jo Ann had very specific instructions as to how this

fund-raiser needed to be handled including billing by Hughes and payment by the Harman campaign and I agreed to all criteria.

    4. At all times during my dealings with Hughes, I acted in response to the directions I received from the Hughes legal counsel via Jo Ann Costa.

Exhibit 6 to Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment.

stances, it was reasonable for the Harman Campaign to rely on the representation that Hughes' counsel had determined that the fundraiser was conducted lawfully. Consequently, the Court finds that defendants' belief that the fundraiser was in compliance with federal election law is relevant to demonstrating defendants' good faith. Moreover, even if the advice of counsel defense were not available, the FEC has failed to show that defendants acted in bad faith.

Even if defendants acted in good faith, the FEC argues that disgorgement and a penalty are appropriate because of the public harm caused by the violations.

Deliberate or serious violations of the federal election laws may lead to a finding of public harm. See Furgatch, 869 F.2d at 1259 (finding that importance of reporting and disclosure provisions in federal election law "justify a rule allowing a district court to presume harm to the public from the magnitude or seriousness of the violation of these provisions"). As discussed above, it does not appear that deliberate or serious violations occurred in this case.

The FEC also contends that based on defendants' "determined resistance" to conciliation in this action, a penalty should be assessed. The Court concludes that this argument is without merit. Defendants were entitled to have the complicated statutory and regulatory issues in this case determined by a court. Cf. California Med. Ass'n, 502 F.Supp. at 204 (noting that FEC limited penalty request "because of the complex constitutional and statutory questions surrounding this litigation").

Based on the nature of the violations involved in this case, the absence of any showing that such violations were deliberate or that defendants acted in bad faith, the Court finds that disgorgement of the contributions collected at the October 1993 fundraiser is inappropriate. The Court further finds that a civil penalty is not warranted under the circumstances of this case.[17]

### D. Injunctive relief

■ The FEC also seeks a permanent injunction against defendants for future violations of the Act. Injunctive relief is appropriate only when there is a likelihood of future violations. See id.; Furgatch, 869 F.2d at 1262; Federal Election Comm'n v. Committee of 100 Democrats, 844 F.Supp. 1, 8 (D.D.C.1993).

■ No evidence has been submitted by the FEC that defendants have ever violated any other provisions of the Act. In addition, the Harman Campaign is no longer in existence, and Representative Harman is no longer in office. The Court finds that under these circumstances, the likelihood of future violations is extremely remote, if not non-existent. Consequently, the Court finds that injunctive relief is not warranted in this action.

## VII. CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is hereby granted, and defendants' motion for summary judgment is denied. The Court finds that based on the facts and circumstances of this case no penalty or injunctive relief is appropriate. Each side shall bear its own attorneys' fees and costs.

IT IS SO ORDERED.

### JUDGMENT

Pursuant to the Court's memorandum and order dated August 18, 1999, granting plaintiff's motion for summary judgment and denying defendants' motion for summary for summary judgment, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff shall have judgment against defendants. Each side

---

**17.** Plaintiff has also filed a request for additional discovery pursuant to Rule 56(f) regarding the advice of counsel defense. The Court finds that additional discovery on this subject is irrelevant because it could not affect the Court's disposition of this matter.